Case No. 21-56305

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

**JOCELYN SUSAN BUNDY**,

Plaintiff/Appellant,

v.

**NIRVANA L.L.C.; LIVE NATION MERCHANDISE, LLC; MERCH TRAFFIC LLC; SILVA ARTIST MANAGEMENT, LLC,**

Defendants/Appellees.

---

On Appeal from

the United States District Court for the Central District of California

Case No. 2:21-cv-03621-DSF (MAA)

Honorable Dale S. Fischer

---

## APPELLANT'S OPENING BRIEF

---

Inge DE BRUYN (SBN 327912)
MODO LAW, P.C.
4218 Via Padova
Claremont, CA 91711
Telephone: (323) 983-2188
Email: inge.debruyn@modo-law.com

*Attorney for Plaintiff-Appellant.*

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................1

REQUEST FOR ORAL ARGUMENT ...................................................2

JURISDICTIONAL STATEMENT .......................................................3

ISSUES PRESENTED ...........................................................................4

STATEMENT OF THE CASE ...............................................................5

    1.    The Parties ...............................................................................5

    2.    Defendants' Misconduct ..........................................................5

    3.    The District Court Proceedings ...............................................6

SUMMARY OF ARGUMENT ...............................................................7

STANDARD OF REVIEW ...................................................................10

ARGUMENT ........................................................................................11

    1.    The District Court Misunderstood the Legal Standard for *Forum Non Conveniens* Dismissals and Understated Defendants' Burden .................13

    2.    Defendants' Motion To Dismiss Should Have Been Denied As A Matter Of Law Because England Is Not An Adequate Alternative Forum ......................................................................................14

        2.1.    The district court did not hold Defendants to their burden to establish "in the first instance" that they were all amenable to process in England .........................................15

        2.2.    Plaintiff established that England is not an adequate forum for her U.S. copyright infringement claims.........................................16

i

2.2.1. Under *Lucasfilm*, an English court will not exercise jurisdiction over U.S. copyright infringement claims when the validity of the U.S. copyright is at issue. ..............17

2.2.2. Defendants did not present any evidence that controverts the U.K. Supreme Court's ruling in *Lucasfilm* ............................................................................20

3. The District Court's Analysis and Balancing of the Private & Public Interest Factors was Unreasonable..........................................................23

3.1. The district court failed to give adequate deference to Bundy's choice of forum..................................................................................23

3.2. The court attached disproportionate weight to "potential issues" regarding Bundy's copyright ownership ...........................28

3.3. Defendants did not establish, and the District Court erred to find, that the public interest factors favor dismissal ......................30

3.3.1. Plaintiff's main claims turn on U.S. copyright law .............31

3.3.2. California has a strong interest in preventing copyright infringement in California, the U.S., and the rest of the world by California residents ...............................................35

3.3.3. Because of California's strong connection to this action, the costs of resolving a dispute unrelated to this forum & the burden on local courts and juries weigh against dismissal ............................................................................37

3.3.4. The factor of court congestion weighs against dismissal .....40

3.4. Defendants did not establish that the private interest factors favor dismissal..................................................................................41

3.4.1. Both the residence-of-parties and convenience-to-litigants factors favor Bundy's choice of a California forum because all Defendants are at home in California .....41

    3.4.2. The residence-of-witnesses factor also weighs against dismissal because Defendants failed to identify any U.K. witnesses who are material to their defense and unavailable to the U.S. forum ................................................44

    3.4.3. The access-to-evidence factor also weighs against dismissal because Defendants did not identify any evidence in the U.K. to which they do not have access .......47

    3.4.4. The district court erred that the enforceability-of-judgment factor favors dismissal because it is always more complex to enforce a foreign judgment against a U.S. defendant than a U.S. judgment ...................................51

    3.4.5. The District Court erred to find the seventh factor neutral when it failed to consider Plaintiff's "other practical problems and other facts that contribute to an efficient resolution". ............................................................54

4.    This Case Should Be Reassigned on Remand ..........................................58

CONCLUSION ......................................................................................................60

# TABLE OF AUTHORITIES

**Cases**

*Aguas Lenders Recovery Group LLC v. Suez, S.A.*,

    585 F.3d 696 (2d Cir. 2009) ........................................................................29

*Argus Media Ltd. v. Tradition Financial Services Inc.*,

    09 Civ. 7966 (HB) (S.D.N.Y. Dec. 29, 2009) ...............................................33

*Bank of Credit and Commerce v. Bk. of Pakistan*,

    273 F.3d 241 (2d Cir. 2001) ...................................................................22, 49

*Beijing iQIYI Sci. & Tech. Co. v. iTalk Glob. Commc'ns, Inc.*,

    CIVIL No. 6-19-CV-00272-ADA (W.D. Tex. Dec. 17, 2019) ....................48

*Boosey & Hawkes Music Publishers v. Walt Disney*,

    145 F.3d 481 (2d Cir. 1998) ...................................................................11, 43

*Boston Telecomms. Grp., Inc. v. Wood*,

    588 F.3d 1201 (9th Cir. 2009) ................................................................35, 45

*Byrne v. British Broadcasting Corp.*,

    No. 00CIV.3141(SHS) (S.D.N.Y. Feb. 22, 2001) ...............................8, 34, 56

*Carijano v. Occidental Petroleum Corp.*,

    643 F.3d 1216 (9th Cir. 2011) .............8, 13, 16, 24, 25, 29, 35, 36, 39, 42, 46

*Cheng v. Boeing Co.*,

    708 F.2d 1406 (9th Cir. 1983) ................................................................12, 14

*City of Almaty v. Khrapunov*,

    No. 15-56627 (9th Cir. Mar. 30, 2017) ....................................................16, 35

*Clanton v. Wyndham Destination, Inc.*,

    No. 3:19-cv-05685-RBL (W.D. Wash. Dec. 13, 2019)................................37

*Creager v. Yoshimoto*,

    No. C 05-01985 JSW (N.D. Cal. Mar. 14, 2006).........................................37

*Creative Technology, Ltd. v. Aztech System Pte, Ltd.*,

    61 F.3d 696 (9th Cir. 1995)..............................................................19, 31, 33

*DiRienzo v. Philip Servs. Corp.,*

    294 F.3d 21 (2d Cir. 2002)..........................................................................26

*Doe v. Exxon Mobil Corp.*,

    69 F. Supp.3d 75 (D.D.C. 2014) ...................................................................9

*Dole Food Co. v. Watts*,

    303 F.3d 1104 (9th Cir. 2002).................................................9, 11, 12, 13, 14

*Dow Chemical Co. v. Castro Alfaro*,

    786 S.W.2d 674 (Tex. 1990) .......................................................................43

*El–Fadl v. Cent. Bank of Jordan*,

    75 F.3d 668, 677 (D.C. Cir. 1996) ........................................................21, 22

*Galustian v. Peter*,

    591 F.3d 724 (4th Cir. 2010)......................................................................25

*Gates Learjet Corp. v. Jensen*,

    743 F.2d 1325 (9th Cir. 1984)................................................................41, 48

*Gulf Oil Corp. v. Gilbert*,

    330 U.S. 501 (1947) ...........................................................................8, 11, 38

*Halo Creative & Design Ltd. v. Comptoir Des Indes Inc.*,

    816 F.3d 1366 (Fed. Cir. 2016) .....................................................................15

*In re Air Crash at Madrid, Spain, on August 20, 2008*,

    893 F. Supp. 2d 1020 (C.D. Cal. 2011).........................................................57

*In re Air Crash Crash off Long Island, N.Y.*,

    65 F. Supp. 2d 207 (S.D.N.Y. 1999) .............................................................57

*In re Air Crash Over the Taiwan Strait on May 25*,

    331 F. Supp. 2d 1176 (C.D. Cal. 2004).....................................................40, 56

*In re Union Carbide Corp. Gas Plant Disaster*,

    809 F.2d 195 (2d Cir. 1987) ..........................................................................50

*Iragorri v. Int'l Elevator, Inc.,*

    203 F.3d 8 (1st Cir. 2000) ..................................................................21, 24, 42

*LaParade v. Ivanova*,

    387 F.3d 1099 (9th Cir. 2004).......................................................................32

*Lehman v. Humphrey Cayman, Ltd.*,

    713 F.2d 339 (8th Cir. 1983).........................................................................58

*Living Designs, Inc. v. E.I. Dupont De Nemours and Co.*,

    431 F.3d 353 (9th Cir. 2005)..........................................................59

*Lucasfilm Ltd. v. Ainsworth*

    [2011] UKSC 39.........................................................9, 17, 20, 21

*Lueck v. Sundstrand Corp.*,

    236 F.3d 1137 (9th Cir. 2001)...............................................38, 39

*Manu Int'l S.A. v. Avon Products Inc.*,

    641 F.2d 62 (2d Cir. 1981)....................................................11, 58

*Matsushita Elec. Indus. Co. v. Zenith Radio*,

    475 U.S. 574 (1986) ..................................................................30

*Mujica v. Occidental Petroleum Corp.*,

    381 F. Supp. 2d 1134 (C.D. Cal. 2005).......................................52

*Murray v. British Broadcasting Corporation*,

    81 F .3d 287 (2d Cir. 1996)...................................................55, 56

*Neelon v. Bharti*,

    596 F. App'x 532 (9th Cir. 2014) .................................................48

*Neuralstem v. Reneuron,*

    365 F. App'x 770 (9th Cir. 2010) ...........................................35, 49

*Norex Petroleum Ltd. v. Access Indus., Inc.*,

    416 F.3d 146 (2d Cir. 2005)........................................................25

*O'Reilly v. Valley Ent., Inc.,* Case No. C-09-03580-CW (DMR),

    2011 WL 13258234 (N.D. Cal. Jan. 4, 2011) ...............................32

*Peregrine Myanmar Ltd. v. Segal*,

    89 F.3d 41 (2d Cir. 1996) ..............................................................26

*Piper Aircraft Co. v. Reyno*,

    454 U.S. 235 (1981) ..........................................8, 14, 21, 23, 35, 55

*Ravelo Monegro v. Rosa*,

    211 F.3d 509 (9th Cir. 2000).....................1, 10, 11, 13, 23, 24, 28

*Reid-Walen v. Hansen*,

    933 F.2d 1390 (8th Cir. 1991).......................................................22

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,

    549 U.S. 422 (2007) ...............................................................13, 23

*SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*,

    382 F.3d 1097 (11th Cir. 2004)....................................................26

*State of Cal. v. Montrose Chem. Corp. of California*,

    104 F.3d 1507 (9th Cir. 1997).......................................................59

*Subafilms, Ltd. v. MGM-Pathe Communications Co.*,

    24 F.3d 1088 (9th Cir. 1994).........................................................19

*Tuazon v. R.J. Reynolds Tobacco Co.*,

    433 F.3d 1163 (9th Cir. 2006).........................................28, 35, 39

*United States v. Arnett*,

    628 F.2d 1162 (9th Cir. 1979) ........................................................................58

*United States v. Lefler*,

    880 F.2d 233 (9th Cir. 1989) ..........................................................................11

*Vivendi SA v. T-Mobile USA Inc.*,

    586 F.3d 689 (9th Cir. 2009) ..........................................................................29

*Yager v. Starwood Hotels & Resorts Worldwide, Inc.*,

    CIVIL ACTION No. 12-4789 (E.D. Pa. June 3, 2013) ..................................56

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*,

    433 F.3d 1199 (9th Cir. 2006) ........................................................................53

**Statutes**

17 U.S.C. § 101 ...................................................................................................18

17 U.S.C. § 104A .....................................................................................6, 18, 32

17 U.S.C. § 1202 ...................................................................................................3

17 U.S.C. § 201 ...................................................................................................34

17 U.S.C. § 501 .....................................................................................................3

28 U.S.C. § 1291 ...................................................................................................4

28 U.S.C. § 1331 ...................................................................................................3

28 U.S.C. § 1338(a) ..............................................................................................3

28 U.S.C. § 1367(a) ..............................................................................................3

28 U.S.C. § 2106 ...................................................................58

Cal. Civ. Proc. Code § 1723 .................................................53

Cal. Code Civ. Proc. §§ 1713-1725.......................................51

Cal. Code Civ. Proc. §§ 680.010-724.260.............................51

Cal. Code Civ. Proc. §1718...................................................52

**Other Authorities**

14D Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal

Practice and Procedure, § 3828.2 (2007) ...........................13

Martin Davies, *Time to Change the Federal Forum Non Conveniens*

*Analysis*, 77 Tul. L. Rev. 309, 319 (2002) ..........................50

U.S. COPYRIGHT OFFICE, COMPENDIUM OF U.S. COPYRIGHT

OFFICE PRACTICES § 2002.1 (3d ed. 2021) ....................19

**Rules**

Fed. R. App. P. 4(a)(4)(A).......................................................4

Fed. R. Civ. P. 59 .................................................................3, 7

Fed. R. Civ. P. 60 .................................................................3, 7

# INTRODUCTION

When C.W. Scott-Giles was asked, in 1946, by his friend Dorothy Sayers to illustrate her translation of Dante's *La Divina Commedia*, he could not have imagined that, decades later, an iconic American grunge band would steal one of his drawings, claim authorship and ownership of it, and make a small fortune from its expansive use of it on commercial merchandise. That band was Nirvana.

And he certainly could not have imagined that his granddaughter and sole heir Jocelyn Bundy, the Plaintiff, would be denied access to a U.S. court for infringement of the U.S. copyright in that illustration by several affluent American companies.

Dismissal of a case for *forum non conveniens* is "an exceptional tool to be used sparingly." *Ravelo Monegro v. Rosa*, 211 F.3d 509, 514 (9th Cir. 2000). It cannot serve as a vehicle to decide a case on its merits without proper argument, nor to shield American defendants from liability for harm they have inflicted upon a foreign citizen in the U.S. in blatant violation of U.S. laws. Yet this is exactly the outcome of what the District Court decided here, and Plaintiff respectfully requests this Court to undo that wrong.

# REQUEST FOR ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a), Plaintiff respectfully requests oral argument. Plaintiff believes that oral argument will assist the Court in deciding the issues presented on appeal.

The District Court has stated that there is a circuit split as to the standard that applies in assessing the so-called *Gilbert* factor that deals with "the local interest of a lawsuit" in a *forum non conveniens* analysis. If the Court agrees that there is a split, this case presents an opportunity to resolve it.

Further, Plaintiff would also appreciate the chance to address the propriety of *forum non conveniens* dismissals in multi-territorial copyright infringement cases where the actions of Americans cause harm both here and abroad. Plaintiff believes that allowing such cases to be dismissed for alleged inconvenience erodes the national treatment principle guaranteed by international copyright conventions that the U.S. has adhered to.

Given the potential precedent that could be set by this case, the Court would likely benefit from getting to question the parties and hear elaboration on the issues presented.

# JURISDICTIONAL STATEMENT

Plaintiff-Appellant Jocelyn Susan Bundy sued Defendants in the United States District Court for the Central District of California on April 28, 2021, stating four claims for relief: (1) copyright infringement under 17 U.S.C. § 501; (2) violations of the integrity of copyright management information under 17 U.S.C. § 1202; (3) copyright infringement under U.K. law; and (4) copyright infringement under German law. 3-ER-499.

The District Court had subject matter jurisdiction over the first and second claims for relief (violations of federal copyright laws) under 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a).

The District Court had supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367(a) because those claims arise from a common nucleus of operative facts and are so closely related to the first and second causes of action they form part of the same case or controversy.

On October 21, 2021, the District Court issued an Order by which it dismissed the action without prejudice for *forum non conveniens* and entered a corresponding final Judgment on November 4, 2021. 1-ER-16–34.

On December 1, 2021, Plaintiff moved to alter or amend the judgment under Fed. R. Civ. P. 59 or for relief from a judgment under Fed. R. Civ. P. 60. 3-ER-597.

This tolled the time to appeal. Fed. R. App. P. 4(a)(4)(A). On April 8, 2022, the District Court denied that motion. 1-ER-2–15.

On December 3, 2021, Plaintiff timely filed a notice of appeal as to the District Court's Order and Judgment dismissing the case. 3-ER-589–590. On April 11, 2022, she timely filed an amended notice to include appellate review of the District Court's denial of her motion for reconsideration. 3-ER-587–588.

Plaintiff's appeal is from final decisions that dispose of all the parties' claims. This Court thus has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

Did the District Court abuse its discretion by taking the harsh and extraordinary measure of dismissing Plaintiff's case on the grounds of *forum non conveniens* when (i) Plaintiff is seeking relief for misconduct that occurred substantially in the local forum by local Defendants, (ii) there is no indication of forum-shopping, (iii) Defendants failed to establish the existence of an available and adequate foreign forum, (iv) evidence pertaining to the *Gilbert* factors was ignored or afforded improper consideration, and (v) Defendants failed to show that litigating the matter in the local forum—their home forum—would result in disproportionate oppression and vexation?

# STATEMENT OF THE CASE

## 1.    The Parties

Plaintiff-Appellant Jocelyn Bundy is the granddaughter and sole heir of C.W. Scott-Giles. 3-ER-502, ¶14. She is the sole owner of the copyright in an illustration created by her grandfather titled "Upper Hell" (the "Illustration). 3-ER-500, ¶1.

Defendant-Appellee Nirvana L.L.C. is the entity that manages the business interests of former rock band Nirvana and profits from the licensing and sale of Nirvana-branded merchandise. 3-ER-508, ¶40. It has its principal place of business in Encino, CA. 3-ER-383.

Defendant-Appellee Silva Artist Management LLC oversees the careers, estates, and business interests of Nirvana (and its L.L.C.). 3-ER-502, ¶11. It is based in Los Angeles, CA. 3-ER-386.

Defendants-Appellees Live Nation Merchandise, LLC and Merch Traffic LLC are subsidiaries of Live Nation Entertainment, Inc. They are merchandise companies that handle sales of Nirvana-branded products, including products bearing the Illustration. Upon information and belief, they have their principal place of business in Beverly Hills, CA. 3-ER-502, ¶¶12-13; 3-ER-495–498.

## 2.    Defendants' Misconduct

Plaintiff is the current owner of the copyright in the Illustration. 3-ER-502–503, ¶¶14-17. On or about January 20, 2021, Plaintiff discovered that, for a few

decades now, Defendants have been selling various articles of merchandise depicting an image virtually identical to the Illustration. 3-ER-503, ¶¶18-21. Further research revealed that Nirvana is also claiming authorship and ownership of the Illustration through false public statements and false copyright notices. 3-ER-504–505, ¶¶22-23. It appears that that misconduct occurred on a worldwide scale with the bulk of it in the United States. 3-ER-508–512, ¶¶40-53.

Defendants were asked several times to cease the infringements and account for their past profits. 3-ER-541–586. While they seem to have ceased some of it, infringing products are still being sold today for Defendants' benefit. 2-ER-49–90. Plaintiff never received an accounting.

Defendants are trying to avoid liability for their U.S. infringements by claiming that the Illustration is in the U.S. public domain (*quod non*) or that they are "reliance parties" under 17 U.S.C. 104A vis-à-vis the restored U.S. copyright in it (*quod non*). As for the other territories, Defendants appear to admit their wrongdoing but are apparently hoping that a U.S court will not accept jurisdiction over those claims. 3-ER-566–567; 3-ER-581–583.

### 3.    The District Court Proceedings

After a lengthy attempt to settle this dispute out-of-court (3-ER-541–586), on April 28, 2021, Plaintiff filed suit in the Central District of California—the only

forum in which she could perfect jurisdiction over all Defendants and where most of the wrongful conduct took place. 3-ER-499.

On August 9, 2021, Defendants moved to dismiss the Complaint for *forum non conveniens* or, alternatively, to decline supplemental jurisdiction over the English and German copyright infringement claims. 3-ER-594.

On October 21, 2021, the District Court entered an Order granting Defendants' motion for *forum non conveniens* and dismissing the action without prejudice. The District Court made the dismissal contingent on (i) Defendants' acceptance of certain conditions and (ii) a U.K. court's acceptance of jurisdiction over Bundy's claims, including her U.S. copyright claims. 1-ER-17–34. Following Defendants' acceptance of the imposed conditions, the District Court entered Judgment on November 4, 2021. 1-ER-16.

On December 1, 2021, Plaintiff moved to alter or amend that judgment under Fed. R. Civ. P. 59 or for relief from that judgment under Fed. R. Civ. P. 60. On April 8, 2022, the District Court denied Plaintiff's motion. 1-ER-2–15.

Plaintiff timely appealed all decisions. 3-ER-587–590.

## SUMMARY OF ARGUMENT

"The doctrine of *forum non conveniens* was developed to thwart 'a strategy of forcing the trial at a most inconvenient place for an adversary.'" *Byrne v. British*

*Broadcasting Corp.*, No. 00CIV.3141(SHS), at *1 (S.D.N.Y. Feb. 22, 2001) (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947)). "The doctrine permits a court to dismiss an action to enable it to be re-filed in a more convenient foreign forum." *Id.* (citations omitted). "[D]ismissal will ordinarily be appropriate where trial in the plaintiff's chosen forum imposes a heavy burden on the defendant or the court, and where the plaintiff is unable to offer any specific reasons of convenience supporting his choice." *Id.* (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249 (1981)).

Plaintiff sued Defendants in the only forum where they are all subject to personal jurisdiction—the forum of their principal place of business. Not coincidentally, this is also the forum where most of their infringing conduct took place. Nonetheless, the District Court held that the case must be heard in England.

Under this Court's controlling precedent, Defendants bore the dual burden to establish that (i) there is an adequate alternative forum for Plaintiff's claims and that (ii) litigation in Plaintiff's chosen forum would "result[] in oppressiveness and vexation … out of all proportion to [Plaintiff's] convenience." *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1127 (9th Cir. 2011) (internal quotation marks omitted). Yet Defendants presented no evidence to satisfy either burden. Absent such evidence, the District Court's decision to dismiss the case was an abuse of discretion.

First, the District Court abused its discretion by failing to require Defendants to establish that England is an available and adequate forum. The District Court simply accepted attorney argument, without any evidentiary support, that (i) all Defendants would be amenable to service of process in England and that (ii) a U.K. court would exercise jurisdiction over all of Plaintiff's claims, including her U.S. copyright claims. Moreover, the District Court misinterpreted the U.K. Supreme Court's ruling in *Lucasfilm Ltd. v. Ainsworth* [2011] UKSC 39, erroneously found that a U.K. court *might* exercise jurisdiction over Plaintiff's U.S. copyright claims and that, therefore, England is an adequate alternative forum.

"An alternative forum is only available if the entire case and all parties can come within the jurisdiction of that forum." *Doe v. Exxon Mobil Corp.*, 69 F. Supp.3d 75, 88 (D.D.C. 2014). Defendants' failure to establish *for a fact* that the entire case can come within the jurisdiction of an English court, and the Court's own ambivalence in that respect, should have been fatal to Defendants' motion. Here, it was not.

Second, the District Court abused its discretion by failing to accord proper deference to Plaintiff's forum choice. It is well-settled that a plaintiff's chosen forum is presumed rightful and that it should not be disturbed absent exceptional circumstances. The onus was on Defendants to prove such exceptional circumstances. *Dole Food Co. v. Watts*, 303 F.3d 1104, 1118 (9th Cir. 2002).

Defendants did not, and could not, carry that burden. There is no indication of forum-shopping. Plaintiff sued in California for copyright infringement and other wrongs that occurred in California and that resulted from decisions made in California by forum residents. Most material witnesses are also located here. Defendants made no showing that litigation at home would pose a bigger burden than litigation in England, nor that their alleged inconvenience would be out of proportion to Plaintiff's convenience. Absent that showing, the District Court had no grounds to conclude that the private or public interest factors favor dismissal, much less that those factors overcome the substantial weight due to Plaintiff's choice of forum.

## STANDARD OF REVIEW

A dismissal for *forum non conveniens* is generally reviewed under an abuse of discretion standard. *Ravelo Monegro*, 211 F.3d at 511. A district court abuses its discretion if it (i) relied on an erroneous view of the law, (ii) relied on a clearly erroneous assessment of the evidence, or (iii) struck an unreasonable balance of relevant factors. *Id.*

A district courts' discretion is subject to "meaningful appellate review" and "[a] dismissal for *forum non conveniens* will be upset on appeal where a defendant has failed to demonstrate that 'an adequate alternative forum exists' and that 'the balance of convenience tilts strongly in favor of trial in the foreign forum.'" *Boosey*

& *Hawkes Music Publishers v. Walt Disney*, 145 F.3d 481, 491 (2d Cir. 1998) (citation omitted). *See also Manu Int'l S.A. v. Avon Products Inc.*, 641 F.2d 62, 65 (2d Cir. 1981) (quoting *Gilbert*, 330 U.S. at 508) (emphasizing appellate obligation to enforce principle that "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed").

"Denial of a motion for reconsideration is reviewed for abuse of discretion." *United States v. Lefler*, 880 F.2d 233, 235 (9th Cir. 1989).

# ARGUMENT

A plaintiff decides where to file her claims and is not required to choose the "optimal" forum. *Ravelo Monegro*, 211 F.3d at 514. So long as a plaintiff's chosen forum has personal jurisdiction over a defendant, a plaintiff's choice is presumed legitimate and will be disturbed only in extraordinary circumstances. *Id.*

The burden of justifying a dismissal for *forum non conveniens* falls on the defendant. *Dole Food*, 303 F.3d at 1118. To prevail, the defendant must present evidence demonstrating (i) that there is an adequate alternative forum, and (ii) that the balance of private and public interest factors "strongly" favors dismissal. *Id.*

When appraising these issues, courts must be mindful that dismissal for *forum non conveniens* is "an exceptional tool to be employed sparingly." *Ravelo Monegro*, 211 F.3d at 514. "'[T]he standard to be applied … is whether … defendants have

made a clear showing of facts which … establish **such oppression and vexation** of a defendant as to be out of proportion to plaintiff's convenience, which may be shown to be slight or nonexistent.'" *Dole Food*, 303 F.3d at 1118 (quoting *Cheng v. Boeing Co.*, 708 F.2d 1406, 1410 (9th Cir. 1983)) (emphasis added). Absent such a showing, the plaintiff's choice of forum should not be disturbed. *Id.*

Defendants fell far short of meeting that heavy burden here. On essential elements of the *forum non conveniens* analysis, they supplied no evidence. On other elements, Defendants provided only scant evidence, which, even if accepted, did not come close to the "clear showing" of exceptional circumstances that Defendants had to make. But rather than finding that Defendants had failed to meet their burden, the District Court stepped in and substituted its own assumptions for Defendants' missing evidence.

At times, the District Court went even further and flipped the burden onto Plaintiff to *dis*prove elements and facts that Defendants had yet to establish. The District Court compounded these errors by misapplying the legal standard, misconstruing the factual record, and failing to strike a reasoned balance of the public and private interest factors. Its dismissal of this case about copyright infringement in California by California Defendants, in favor of an English court, was an abuse of discretion.

1.    **The District Court Misunderstood the Legal Standard for**
      ***Forum    Non    Conveniens*** **Dismissals    and    Understated**
      **Defendants' Burden**

"Federal courts are unanimous in concluding that the defendant bears the
burden of persuasion on all elements of the *forum non conveniens* analysis." 14D
Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and
Procedure, §3828.2 (2007)). "A defendant invoking *forum non conveniens*
ordinarily bears a **heavy burden** in opposing the plaintiff's chosen forum."
*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007)
(emphasis added). *Forum non conveniens* dismissals are "an exceptional tool to be
employed sparingly." *Ravelo Monegro*, 211 F.3d at 514 .

While the District Court acknowledged Defendants' burden (1-ER-20), it
understated the weight of it and ultimately failed to require Defendants to carry it.

This Court has repeatedly found—including in actions brought by foreign
plaintiffs—that the harsh measure of dismissal for *forum non conveniens* requires a
defendant to show **such oppression and vexation as to be out of proportion to the
plaintiff's convenience**, which may be slight or nonexistent. *See, e.g., Ravelo
Monegro*, 211 F.3d at 514; *Carijano*, 643 F.3d at 1227; *Dole Food*, 303 F.3d at 1118.

Nowhere did the District Court even mention this well-established standard,
much less apply it. Instead, the District Court applied a different standard. Rather

13

than presumptively respecting Plaintiffs' choice of forum, the District Court decided for itself, *de novo*, which forum it thought most appropriate.

The District Court's understatement of Defendants' significant burden to establish their disproportionate inconvenience of litigating in this forum—their home forum—tainted its entire analysis and drove the erroneous outcome. It was an abuse of discretion not to hold Defendants to their "heavy" burden (or, frankly, any burden at all).

## 2. Defendants' Motion To Dismiss Should Have Been Denied As A Matter Of Law Because England Is Not An Adequate Alternative Forum

As a threshold matter, Defendants had to prove the existence of an adequate alternative forum. *See Cheng*, 708 F.2d at 1411. "A foreign forum is available when the *entire case and all parties* can come within the jurisdiction of that forum." *Dole Food*, 303 F.3d at 1118 (citation omitted).

This involves a two-part inquiry: availability and adequacy. **Availability** required Defendants to establish that they are *all* amenable to process in the foreign forum's jurisdiction. *See Piper*, 454 U.S. at 255 n.22. **Adequacy** required Defendants to establish that the foreign forum permits litigation of the entire dispute and all stated claims. Dismissal is not warranted if there is any danger that the plaintiff will be deprived of a remedy for those claims. *See Piper*, 454 U.S. at 254-255.

14

Establishing the adequacy of a foreign forum is considered "particularly important" when the dispute implicates the enforcement of intellectual property rights. *Halo Creative & Design Ltd. v. Comptoir Des Indes Inc.*, 816 F.3d 1366, 1373 (Fed. Cir. 2016). "The policies underlying United States copyright, patent, and trademark laws would be defeated if a domestic forum to adjudicate the rights they convey was denied without a sufficient showing of the adequacy of the alternative foreign jurisdiction. It is largely for this reason that district courts have routinely denied motions to dismiss on forum non conveniens grounds when United States intellectual property rights form the crux of the dispute." *Id.*

Defendants did not carry their burden on either element.

### 2.1. The district court did not hold Defendants to their burden to establish "in the first instance" that they were all amenable to process in England

As U.S. entities with a U.S. domicile and no known presence in the U.K., Defendants cannot be served in England and are not subject to personal jurisdiction there. The District Court acknowledged that Defendants' amenability to service of process in the U.K. was "*a sine qua non*" to determine that forum's adequacy and an element on which they carried the burden of proof. 1-ER-21.

Although an easy burden to meet, it required *all* Defendants to agree *on the record* to submit to the jurisdiction of the English courts. Yet only one Defendant did. 3-ER-494, ¶9. Even after Bundy raised this issue, Defendants still did not

15

supplement the record with affidavits or stipulations to support their contentions regarding all other Defendants.

This Court has held that defendants who move for dismissal do not meet their burden of showing amenability to process in the foreign forum when "they fail[] to present evidence on this issue." *See City of Almaty v. Khrapunov,* No. 15-56627, at *3 (9th Cir. Mar. 30, 2017) (holding it was Defendants' burden "in the first instance" to establish their amenability to service); *Carijano*, 643 F.3d at 1225 (finding that defendant established its amenability based on, *inter alia*, its "stipulation" to service of process there).

Conditioning the dismissal on acceptance of U.K. jurisdiction *post facto*, as here (1-ER-33), is not a substitute for the burden that Defendants bore "in the first instance." The Court abused its discretion when it did not hold Defendants to that burden and simply relied on attorney argument.

### 2.2. Plaintiff established that England is not an adequate forum for her U.S. copyright infringement claims.

Further, the District Court also failed to hold Defendants to their burden to establish that England is an adequate forum *for the entire case*, even after Plaintiff cited authority that states it is not.

### 2.2.1. Under *Lucasfilm*, an English court will not exercise jurisdiction over U.S. copyright infringement claims when the validity of the U.S. copyright is at issue.

In the landmark case *Lucasfilm Ltd. v. Ainsworth* [2011] UKSC 39, the U.K. Supreme Court ruled that jurisdiction of U.K. courts over foreign intellectual property claims—such as U.S. copyrights—turns on whether the dispute involves the *validity* of the asserted rights or the alleged *infringement* thereof. It held that U.K. courts can only exercise jurisdiction over foreign copyright infringement claims *when the validity of the right is not in dispute*. Or, as the District Court correctly observed, "a U.K. court will not concern itself with determining the validity or registration of a foreign copyright for purposes of evaluating any infringement of the foreign copyright." The District Court even explained the rationale behind this distinction: "[A]s the court in *Lucasfilm* recognized, 'States have an interest in the international recognition and enforcement of their copyrights.' … Permitting a U.K. citizen to haul a foreign defendant into a U.K. court to have the U.K. court determine whether the … foreign copyright is valid would violate the principle of 'international recognition and enforcement.'" 1-ER-23–24.

Yet that is *exactly* what would happen if Bundy were forced to bring her claims against these four U.S. defendants for infringement of her U.S. copyright in the Illustration before an English Court.

Defendants were adamant both in their pre-litigation correspondence (3-ER-541–586) and motion to dismiss that they intend to challenge Bundy's U.S. copyright in the Illustration for failure to comply with registration and other formalities that existed under an older version of the U.S. Copyright Act. Furthermore, they intend to call upon the court to determine that—unlike the copyright in every other "foreign work" that was inadvertently ejected into the U.S. public domain for such non-compliance—the copyright in *this* foreign work would not have been restored by the Uruguay Round Agreements Act enacted in 17 U.S.C. § 104A. Lastly, Defendants plan to argue that, even if the U.S. copyright in the Illustration was restored, they would not qualify as infringers under 17 U.S.C. § 104A.

It is puzzling how the District Court concluded that "[t]he registration and validity of Bundy's copyright does not appear to be an issue here." 1-ER-24.

Its erroneous finding stemmed from a failure to distinguish between a foreign *work* and a foreign *copyright*. As Plaintiff explained in her motion for reconsideration, these are two very different concepts. A foreign **work**—from the perspective of a U.K. court—is a work created by a non-U.K. national or first published outside the U.K.[1] A foreign **copyright**, on the other hand, is the protection

---

[1] Similarly, vis-à-vis a U.S. court, a foreign work is a work that is not a U.S. work under the definition of 17 U.S.C. § 101. Foreign works are thus "works created by author(s) who are not U.S. citizens or U.S. nationals and/or works that were first

18

granted to a work, whether it be to a U.K. work or a foreign work, under the laws of another nation, in this case under the laws of the United States. Copyright laws are national laws. No country can provide copyright protection to a work outside of its own borders. In other words, contrary to what Defendants have suggested, there is no such thing as a U.K. copyright that would be enforceable throughout the world. To mitigate this problem and widen the scope of protection granted to the works of its citizen-authors, most countries have adhered to the Berne Convention for the Protection of Literary and Artistic Works. Through the principle of national treatment, the Berne Convention aims to provide not *extra*-territorial protection but *multi*-territorial protection of original works—i.e., protection under the national laws of its member states.[2]

---

published abroad." U.S. COPYRIGHT OFFICE, COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES § 2002.1 (3d ed. 2021).

[2] This principle of national treatment is explained at length in *Subafilms, Ltd. v. MGM-Pathe Communications Co.*, 24 F.3d 1088 (9th Cir. 1994) and a plethora of other cases since. *See, e.g., Creative Technology, Ltd. v. Aztech System Pte, Ltd.*, 61 F.3d 696, 700-701 (9th Cir. 1995). Prof. Ginsburg also illustrates this point: "U.S. copyrights can be owned by non-U.S. residents. … Not only may a foreigner acquire a U.S. copyright by transfer from a U.S. author or copyright owner, but by virtue of international copyright agreements such as the Berne Convention, to which the United States is a party, a foreigner from a treaty country who creates a work of authorship abroad is automatically a U.S. copyright owner." *See* 2-ER-211–228 at 592-593. **It is precisely this "automatic" ownership of a *U.S.* copyright in the U.K. Illustration that Defendants are challenging** based on registration and other formalities imposed by U.S. copyright laws in effect at the time the Illustration was created.

As a result, a U.K. *work* enjoys multiple *copyrights*: a U.K. copyright (protection under U.K. laws against infringements in the U.K.), a German copyright (protection under German laws against infringements in Germany), etc. Most relevant here, of course, is the U.S. copyright—i.e., the protection the Illustration enjoys under U.S. copyright laws against infringements in the U.S.

It cannot reasonably be disputed that Defendants' entire defense against Plaintiff's main cause of action turns on evaluating the subsistence and validity of the U.S. copyright in the Illustration, and that this is precisely the sort of evaluation that an English court will not engage in.

*Lucasfilm* clearly held that "a U.K. court will not concern itself with determining the validity or registration of a foreign copyright [here a U.S. copyright granted to a U.K. work] for purposes of evaluating any infringement of the foreign copyright." 1-ER-23–24. Therefore, the Court's conclusion that *Lucasfilm* does not apply here, and that the U.K. court is an adequate alternative forum for all of Plaintiff's claims, including her U.S. copyright claims, constitutes clear error.

### 2.2.2. Defendants did not present any evidence that controverts the U.K. Supreme Court's ruling in *Lucasfilm*

Courts are not supposed to deem an alternative forum adequate unless "the defendant demonstrates that the alternative forum addresses the types of claims that the plaintiff has brought." *Iragorri v. Int'l Elevator, Inc.,* 203 F.3d 8, 12 (1st Cir.

2000) (quoting *Piper Aircraft,* 454 U.S. at 254 n. 22). Because the defendant must establish that an adequate alternative forum exists, "this court will reverse when 'the affidavit through which [the defendant] attempted to meet its burden contains substantial gaps.'" *El–Fadl v. Cent. Bank of Jordan,* 75 F.3d 668, 677 (D.C. Cir. 1996) (citation omitted). If the plaintiff provides evidence that controverts the defendant's evidence, "the defendant must provide more detailed information." *Id.* (citation omitted). "If the record before the court is so 'fragmentary' that 'it is impossible to make a sound determination' of whether an adequate alternative forum exists, the court will remand for further development of the facts." *Id.* (citation omitted).

Here, Defendants presented no affidavits or other evidence to support its allegation that a U.K. court will address the types of claims that Plaintiff has brought. Defendants did submit a 25-page affidavit from a U.K. attorney on the intricacies of U.K. copyright law. 3-ER-444–469. Not surprisingly, Defendants' expert is silent on the dispositive ruling in *Lucasfilm* on this issue. While, on reconsideration, the District Court seems to acknowledge that *Lucasfilm* casts serious doubts on the justiciability of Plaintiff's U.S. copyright claims in the U.K., it nonetheless declined to reconsider the forum's adequacy, finding instead that it "addressed Bundy's concerns […] by expressly conditioning the dismissal on a U.K. court's exercise of jurisdiction over her U.S. copyright claims." 1-ER-7–8.

21

In doing so, the District Court erred in two respects:

(i) The District Court incorrectly flipped the burden of proving the *in*adequacy of the English courts onto Plaintiff. The district court was required to hold Defendants to the burden of persuasion on forum adequacy. *See El-Fadl*, 75 F.3d at 679 (D.C. Cir. 1996) (quoting *Reid-Walen v. Hansen*, 933 F.2d 1390, 1394 (8th Cir. 1991)). It did not. In fact, the silence of Defendants' expert on this issue speaks volumes.

(ii) The District Court erred by dismissing this case, despite its own ambivalence about the adequacy of the U.K. as an alternative forum for all of Plaintiff's claims. "[W]hile the conditional dismissal device can help to protect the non-moving party in circumstances where the district court remains concerned about the accuracy of its 'justifiable belief' as to a foreign forum's adequacy, the mechanism is not a substitute for the initial 'justifiable belief' of adequacy." *Bank of Credit and Commerce v. Bk. of Pakistan*, 273 F.3d 241, 248 (2d Cir. 2001). "Conditions cannot transform an inadequate forum into an adequate one." *Id.*

Defendants' failure to establish that U.K. courts permit litigation of Plaintiff's U.S. copyright claims should have been detrimental to its motion. It foreclosed dismissal for *forum non conveniens* and called for the District Court to deny Defendants' motion as a matter of law.

### 3. The District Court's Analysis and Balancing of the Private & Public Interest Factors was Unreasonable.

Defendants' inability to satisfy the threshold requirement of *forum non conveniens*—the existence of an available and adequate alternative forum—should have ended the matter. But even if the private and public interest factors were still relevant, the District Court also abused its discretion in its assessment and balancing of those factors. None of the relevant factors favor dismissal, let alone heavily enough to overcome the deference owed to Plaintiff's choice of forum.

#### 3.1. The district court failed to give adequate deference to Bundy's choice of forum

There is a strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors "clearly" point towards trial in the alternative forum. *Piper Aircraft*, 454 U.S. at 255. This strong presumption also applies to foreign plaintiffs, albeit "with less force." *Sinochem*, 549 U.S. at 430 (quoting *Piper Aircraft*, 454 U.S. at 255–56). "But less deference is not the same thing as no deference." *Ravelo Monegro*, 211 F.3d at 514.

To determine what amount of deference should be given, courts need to consider a plaintiff's motivations. The more a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference owed to that choice. Indeed,

[t]he rule is not so abrupt or arbitrary. One of the factors that necessarily affects a plaintiff's choice of forum is the need to sue in a place where the defendant is amenable to suit … It is not a correct understanding of the rule to accord deference only when the suit is brought in the plaintiff's home district. Rather, the court must consider a plaintiff's likely motivations in light of all the relevant indications. We thus understand the Supreme Court's teachings on the deference due to plaintiff's forum choice as instructing that we give greater deference to a plaintiff's forum choice to the extent that it was motivated by legitimate reasons … and diminishing deference to a plaintiff's forum choice to the extent that it was motivated by tactical advantage.

*Iragorri*, 274 F.3d at 72-73.

This Court has repeatedly held that an action brought by a foreign plaintiff should not be dismissed for *forum non conveniens* when the domestic forum has a "substantial relation" or "strong connection" to the action and the plaintiff is not just forum-shopping. *See Ravelo Monegro*, 211 F.3d at 514*; Carijano*, 643 F.3d at 1229 ("Concerns about forum shopping […] are muted in a case such as this where Plaintiffs' chosen forum is both the defendant's home jurisdiction, and a forum with a strong connection to the subject matter of the case."). A case can have a substantial relation to the action even where the Plaintiffs are foreigners and all alleged misconduct occurred elsewhere.

*Ravelo Monegro* involved a suit filed by 13 baseball players from the Dominican Republic against the San Francisco Giants. Although all plaintiffs resided overseas and all alleged misconduct occurred overseas, this Court still reversed the dismissal for *forum non conveniens*, finding that California had a

24

"substantial relation to the action" because the players' contracts provided for a potential transfer to a U.S.-based team and such a transfer was their common goal.

Similarly, in C*arijano*, this Court reversed the dismissal of an action brought in California by 25 Peruvian indigenous people and a U.S. non-profit against Occidental, a U.S. corporation, for pollution in the Peruvian rainforest.

Here, Plaintiff's forum choice is even more substantially related to the action. Not only are all Defendants American entities that reside here, but Plaintiff's two main claims for relief involve misconduct in California in violation of U.S. laws, while her other claims are for misconduct overseas that resulted from decisions made here.

So, like the plaintiffs in *Carijano*, Bundy "did not strategically choose a random or only tangentially relevant forum" (*see Carijano*, 643 F.3d at 1229); she sued Defendants in their home forum. And, as in *Carijano*, all of Plaintiff's claims are "based on decisions made in and policies emerging from [Defendants'] corporate headquarters in Los Angeles." *Id.*

Courts routinely hold that when a foreign plaintiff sues an American defendant at home, the plaintiff's forum choice is entitled to "substantial" deference. *See, e.g., Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 155-56 (2d Cir. 2005) (finding that "substantial deference" is due when a foreign plaintiff sues a defendant in his home forum); *Galustian v. Peter*, 591 F.3d 724, 732 (4th Cir. 2010)

(providing greater deference when "the defendant is a resident and citizen of the forum he seeks to have declared inconvenient"); *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 46 (2d Cir. 1996) (in weighing the *Gilbert* factors, "the court starts with a presumption in favor of the plaintiff's choice of forum, especially if the defendant resides in the chosen forum").

Because the disputed events occurred in California and California is also Defendants' home, Bundy had very legitimate reasons for suing here. In fact, it is the only place where all Defendants could properly be sued. Her forum choice was thus entitled to *substantial* deference.

While the District Court is adamant it afforded plaintiff's forum choice at least *some* deference, it is not readily apparent how that alleged deference affected its analysis of the *Gilbert* factors, if at all. Even on reconsideration, the District Court declined to elaborate. 1-ER-8–9.

As the Second Circuit explained in *DiRienzo v. Philip Servs. Corp.,* 294 F.3d 21, 28 (2d Cir. 2002), making "only passing reference to the weight entitled plaintiffs' choice" does not absolve it from starting its analysis "with the assumption that a plaintiff's choice of forum will stand unless the defendant can demonstrate that reasons exist to afford it less deference." *DiRienzo*, 294 F.3d at 28. *See also SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1102 (11th Cir. 2004) (reversing dismissal because "even if we were to assume that the

district court correctly understood the proper legal standard, the district court never … incorporates the presumption into its calculus once it actually engages in weighing the private interests").

There is no indication that the District Court analyzed the *Gilbert* factors against the backdrop that even a foreign plaintiff's chosen forum is presumed to be convenient until proven otherwise, much less that it afforded Bundy's forum choice the substantial deference it deserved.

Instead, the District Court started its analysis from a different presumption— that a foreign plaintiff would only bring suit in the U.S. for an improper motive. Without any basis, it assumed that Bundy sued here for monetary gain ("Though the scope of potential relief available in a U.K. court may not be what Bundy envisioned when she filed her claim in the United States …"). 1-ER-22–23. Such an unwarranted assumption is unfortunate.

This Court "may reverse [a dismissal for *forum non conveniens*] when the district court makes a clear error of judgment or applies the wrong legal standard, such as an incorrect presumption regarding the plaintiff's forum choice." *Otto Candies*, 963 F.3d at 1339. Courts also agree that "a plaintiff need not select the optimal forum for his claim, but only a forum that is not so oppressive and vexatious to the defendant 'as to be out of proportion to plaintiff's convenience.'" *Tuazon v.*

27

*R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1180 (9th Cir. 2006) (quoting *Ravelo Monegro,* 211 F.3d at 514).

The District Court's presumption regarding Plaintiff's forum choice was incorrect and it affected the level of deference it afforded that choice. Moreover, Defendants presented no evidence that Plaintiff chose this forum to "oppress, vex, or harass" them, much less that their inconvenience would be out of proportion to Bundy's convenience of proceeding in this district, where she has counsel, access to documents and witnesses, can join other U.S. infringers, and where the court is familiar with the law on which most of her claims are based.

Absent any evidence of forum-shopping, Plaintiff's choice of forum (i) was entitled to substantial deference, (ii) should have weighed heavily against dismissal, and (iii) should not have been disturbed. *See Ravello Monegro*, 211 F.3d at 514. The District Court abused its discretion by not affording Plaintiff's forum choice the appropriate weight, if any.

### 3.2. The court attached disproportionate weight to "potential issues" regarding Bundy's copyright ownership

In addition, the District Court grossly inflated the importance of "potential issues" raised by Defendants regarding Bundy's copyright ownership. 1-ER-26. This overstatement permeated its entire opinion, most notably its analysis of the law it would have to apply to resolve this dispute (*see* 3.3.1 below) and the location of

witnesses and evidence material to the litigation (*see* 3.4.2 and 3.4.3 below). The District Court's disproportionate consideration of these "potential issues" was an abuse of discretion for several reasons.

First, since the District Court dismissed the complaint without a factual hearing on the grounds of *forum non conveniens*, it had to accept as true the facts as alleged in the complaint. *Carijano*, 626 F.3d at 1142 (citing *Vivendi SA v. T-Mobile USA Inc.*, 586 F.3d 689, 691 n. 3 (9th Cir. 2009) and *Aguas Lenders Recovery Group LLC v. Suez, S.A.*, 585 F.3d 696, 697 (2d Cir. 2009). Plaintiff properly alleged that she is the sole owner of the copyright in the Illustration. 1-ER-500. The District Court's failure to accept that fact as true without a factual hearing was an abuse of discretion.

Second, the District Court almost blindly adopted Defendants' speculation about two other potential copyright owners—Penguin Books and the successors-in-interest to Dorothy Sayers—without requiring them to present a single piece of evidence to support that speculation. Interestingly, Defendants did not even make a single attempt to contact those alleged "potential" owners and simply shifted the burden to Plaintiff to prove that they are not.

Third, unlike Defendants, Plaintiff *did* reach out to those parties and obtained sworn declarations in which they both confirmed that they do ***not*** own the copyright in the Illustration. 2-ER-46–48; 3-ER-359–376. Considering those declarations, it

was unreasonable for the District Court to continue to find that copyright ownership dominates this matter. 1-ER-26; 1-ER-6.

It appears that the District Court got swayed by the 25-page exposé of Defendants' U.K. expert about the supposed difficulties of determining copyright ownership under U.K. law (3-ER-444–469), without properly assessing first if there even *is* a genuine dispute about copyright ownership. When conjecture and "metaphysical doubt" about material facts cannot even preclude summary judgment (*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986)), they certainly cannot justify the harsh and exceptional measure of a dismissal for *forum non conveniens*. Holding otherwise would mean that any U.S. defendant sued in U.S. court for infringement in the U.S. of the U.S. copyright in a foreign work could get the case dismissed simply by arguing—without any corroborating evidence—that there *may* be a dispute regarding copyright ownership under foreign law. Such a result is unacceptable.

### 3.3. Defendants did not establish, and the District Court erred to find, that the public interest factors favor dismissal

The District Court considered these public interest factors to guide its discretion: (1) local interest of lawsuit; (2) the court's familiarity with governing law; (3) burden on local courts and juries; (4) congestion in the court; and (5) the costs of resolving a dispute unrelated to this forum." 1-ER-24. The District Court's

30

decision that they argue collectively for dismissal (1-ER-32) was an abuse of discretion.

### 3.3.1. Plaintiff's main claims turn on U.S. copyright law

Finding that English and German law govern some issues, the District Court concluded that the need to apply foreign law "heavily favors dismissal." 1-ER-26. However, entirely missing from the District Court's analysis is the other side of the ledger: (1) the significant questions of U.S. copyright law that an English court would face if it were to exercise jurisdiction over Plaintiff's U.S. claims, and (2) a U.K. court's equal unfamiliarity with German law. A U.K. court is certainly not better equipped than a U.S. court to deal with complex questions of U.S. copyright law, or with questions of German law.

Plaintiff's main claims are for infringements in the U.S. of her U.S. copyright in the Illustration. American copyright law is complex as it is. *See Creative Technology*, 61 F.3d at 704-05 (Ferguson, W.J., dissenting) (pointing out the "enormous complexity" of American copyright law and finding that the district court erred by ignoring this complexity when it dismissed the case for *forum non conveniens*). It becomes even more complex when Defendants, as here, are challenging (i) the validity of the U.S. copyright in the Illustration under *older* versions of the Copyright Act, (ii) the restoration of the U.S. copyright under the

*current* Copyright Act (17 U.S.C. § 104A), and (iii) their status as infringers under 17 U.S.C. § 104A. 3-ER-546–586.

The Court's failure to acknowledge that a U.K. court would need to address hyper-technical aspects of U.S. copyright law to resolve this dispute and its refusal to weigh this in its analysis (1-ER-9–10; 1-ER-26), was an abuse of discretion.

The Court's reasoning that it could discount the importance of the issues governed by American copyright law because "Bundy is putting the cart before the horse" and "seems to misinterpret or otherwise overestimate her ability to state a claim for copyright infringement under U.S. law" is misguided. 1-ER-9.

First, even if there were issues of copyright ownership that would need to be decided under foreign law, the cases cited by the District Court illustrate one point only—that U.S. courts have no problem determining ownership under foreign law and will generally not decline to exercise jurisdiction because of it. In *LaParade v. Ivanova*, 387 F.3d 1099 (9th Cir. 2004), the court determined copyright ownership under Mexican law before it decided the infringement claims under U.S. law. Similarly, in *Itar-Tass*, 153 F.3d 82 (2d Cir. 1998), the court applied Russian law on the ownership issue before it applied U.S. law to determine the owner's rights. Lastly, in *O'Reilly v. Valley Ent., Inc., Case No. C-09-03580-CW (DMR), 2011 WL 13258234* (N.D. Cal. Jan. 4, 2011), the court applied English law to determine ownership before applying U.S. law on the U.S. infringement claim.

32

Indeed, if every metaphysical "dispute" about copyright ownership in a foreign work would cause an infringement action in the U.S. to be dismissed for *forum non conveniens*, it would be all too easy for American defendants to infringe upon foreign works with total impunity. This would effectively erode the principle of national treatment guaranteed by both the Universal Copyright Convention and the Berne Convention, which entitles foreign plaintiffs to the same protections of the U.S. Copyright Act and to the same court standards that U.S. parties enjoy. *See Creative Technology*, 61 F.3d at 700-701.

U.S. parties are never found to be putting the cart before the horse, or to be misinterpreting or overestimating their ability to state a claim for copyright infringement under U.S. law, when they properly plead ownership in their complaint and support their claims with competent evidence. The District Court's failure to accept as true Bundy's copyright ownership as properly pled and its application of a discriminatory standard with respect to a foreign plaintiff constitute clear error.

Second, determining copyright ownership under U.K. law is not particularly complicated,[3] especially since England is a common law country and there are no

---

[3] Twice now, the District Court erred in its interpretation of *Argus Media Ltd. v. Tradition Financial Services Inc.*, 09 Civ. 7966 (HB) (S.D.N.Y. Dec. 29, 2009). 1-ER-26; 1-ER-10. Bundy had cited *Argus*—a case that also involved allegations of infringement of the U.S. copyright in an English work—for the proposition that determining copyright ownership under English law does not involve complex issues of foreign law. The District Court found *Argus* to be inapposite because "the court determined that English law was not applicable and therefore the case did 'not

language barriers. *See Byrne*, No. 00CIV.3141(SHS) at *1 (citation omitted) ("The application of the law of another English common law jurisdiction 'does not impose a significant burden'"). So, even if there were a genuine dispute about copyright ownership, *quod non*, the District Court's burden in resolving that dispute would be minimal. Even Defendants' expert confirms that unless the work is an engraving, photograph, or portrait, or was created by an employee—which Bundy has debunked—the author is the original owner. 3-ER-441–446. *See also* 2-ER-271–281; 2-ER-302–313. That the author is presumed the owner is no different under U.K. law than under U.S. law (17 U.S.C. § 201) or German law (3-ER-467–488). So, as the author's sole heir (3-ER-409–417), Bundy is presumed to be the owner.

Third, as discussed in 3.2 above, there is no genuine dispute regarding copyright ownership, rendering this entire argument moot.

The District Court cited *Piper Aircraft* for the position that "[m]any *forum non conveniens* decisions have held that the need to apply foreign law favors

---

involve complex issues of foreign law.'" 1-ER-26. However, nowhere in *Argus* did the court state that English law would not be applicable. In fact, it acknowledged that, at a minimum, the disputed copyright license was governed by English law. *See Argus*, 09 Civ. 7966 (HB), at *6 n.3 ("[W]hile the fact that the parties agreed to apply English law […] may weigh in favor of dismissal to some degree, it does not dictate that result."). So, the court did not hold that English law was not applicable; it held that the plaintiff's claims arose under U.S. copyright law and that whatever issues of foreign law it needed to address to resolve those U.S. claims are not complex. One of those issues is *always* ownership of the copyright, because establishing ownership is a prerequisite for any copyright infringement claim.

dismissal." (1-ER-26). Yet, *Piper Aircraft* also stated that "this factor alone is not sufficient to warrant dismissal." *Piper Aircraft*, 454 U.S. at 260 n.29. U.S. law dominates this dispute, and whatever peripheral questions of foreign law a court would need to decide to resolve it bleak in comparison to the complex issues of U.S. copyright law that Defendants intend to raise. As such, this factor should have weighed against dismissal. At best, it should have been neutral.

### 3.3.2. California has a strong interest in preventing copyright infringement in California, the U.S., and the rest of the world by California residents

Citing *Carijano*, the District Court believes there is a split of authority in this circuit as to what can be considered in evaluating the local interest of a lawsuit; whether (i) it can compare state interests or whether (ii) it should "ask only if there is an identifiable local interest in the controversy, not whether another forum also has an interest." 1-ER-25. The District Court took the former approach, although this Court's more recent opinions all adopt the latter. *See, e.g., City of Almaty*, No. 15-56627 at *5; *Neuralstem v. Reneuron,* 365 F. App'x 770, 772 (9th Cir. 2010); *Boston Telecomms. Grp., Inc. v. Wood*, 588 F.3d 1201, 1212 (9th Cir. 2009); *Tuazon*, 433 F.3d at 1182. Regardless of the approach, the Court erred in finding this factor *favors* dismissal.

The District Court recognized that California citizens have an interest in the sale and consumption of copyright-infringing products in their forum. 1-ER-25. It is

also well-settled that California has a "significant interest" in providing a forum for those harmed by the actions of its corporate citizens. *Carijano*, 643 F.3d at 1232-1233. Here, all Defendants have their principal place of business in California and the Complaint alleges misconduct in California that causes injury both here and abroad. 3-ER-499–521. As such, California has a significant interest in this case, regardless of any interest that an English court may have.

*Carijano* instructs that when both forums have a significant interest, "under the former view, this factor would tip against dismissal, while under the latter it is neutral." *Id.* at 1233, n.3. In other words, this factor can never *favor* dismissal, much less to a degree that would justify the use of this exceptional tool.

On reconsideration, the District Court seems to admit that its analysis may have been flawed. Yet, rather than correct it, it maintained that even a neutral finding does not affect its overall balancing of the public interest factors. 1-ER-9. That is unreasonable.

Plaintiff respectfully invites this Court to resolve the alleged circuit split and find that when a local forum has a significant interest in the matter, that local interest should weigh *against* dismissal. The view adopted by the District Court cannot be reconciled with the legal standard that dismissal for *forum non conveniens* is a harsh measure and should only be used when both the private and public interest factors "strongly" point to the alternative forum. *See Carijano*, 643 F.3d at 1234 (citation

omitted). Considering this well-established standard, any public interest factor that does not "strongly" militate in favor of dismissal, should not be considered neutral, but should plainly counsel *against* dismissal.

### 3.3.3. Because of California's strong connection to this action, the costs of resolving a dispute unrelated to this forum & the burden on local courts and juries weigh against dismissal

Moving onto the *Gilbert* factors that deal with (i) the costs of resolving a dispute unrelated to this forum and (ii) the burden on local courts and juries, the District Court found the former to be *neutral* and weighed the latter *in favor* of dismissal. 1-ER-26–27.

However, Plaintiff's claims are not "unrelated" to this forum; the bulk of the infringing conduct took place here, all four named Defendants are headquartered here, the main causes of action are rooted in U.S. copyright law, and most witnesses and evidence regarding Defendants' misconduct are located here. 3-ER-499–521. As such, the cost-factor should have weighed *against* dismissal. *See Creager v. Yoshimoto*, No. C 05-01985 JSW, at *12 (N.D. Cal. Mar. 14, 2006) ("This Court previously determined that Plaintiff's claims relate to this forum […] Therefore, this factor favors retention."); *Clanton v. Wyndham Destination, Inc.*, No. 3:19-cv-05685-RBL, at *8 (W.D. Wash. Dec. 13, 2019) (holding that "the cost of resolving a dispute unrelated to this forum weighs against dismissal" because "most of the parties, witnesses, and relevant evidence are located here").

Similarly, the burden on local courts and juries can only support dismissal when the forum has no or little connection with the action. The District Court even cited *Gilbert* for that exact proposition: "Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation." 1-ER-26. The District Court acknowledged that "California citizens have an interest in the sale and consumption of copyright-infringing products in their forum." 1-ER-25. Moreover, the infringers are local companies and their local officers. It cannot reasonably be said this community has no relation to the litigation.

The District Court refused to reconsider this factor because California's interest "does not necessarily mean that the burden and costs associated with the suit weigh against dismissal." 1-ER-10–11. The District Court's reliance on *Lueck v. Sundstrand Corp.*, 236 F.3d 1137 (9th Cir. 2001) is misguided. *Lueck* involved an airplane crash in New Zealand on a New Zealand carrier. All Plaintiffs were New Zealanders. The only connection with Arizona—their chosen forum—was the location of a manufacturer of an allegedly defective plane part that may have contributed to the crash, while the accident report primarily revealed human error by the New Zealand captain. A parallel suit in New Zealand was pending. *Lueck*, 236 F.3d at 1140-1141. Finding the local interest in New Zealand "extremely high" and the Arizona interest "comparatively low," the Arizona court decided that "the

citizens of Arizona should not be forced to bear the burden of this dispute." *Id.* at 1147-1148.

Here, the U.K. interest is no more significant than California's interest. It is not "extremely high" nor is California's interest "comparatively low." California, and by extension the U.S., have a significant interest in policing the misconduct of its corporate residents, especially when that misconduct results in the sale of infringing products, both here and abroad, in violation of U.S. laws and international treaties. Downplaying that interest (1-ER-11) to decline jurisdiction is an abuse of discretion.

Under this Court's precedent, "[j]uries routinely address subjects that are totally foreign to them, ranging from the foreign language of patent disputes to cases involving foreign companies, foreign cultures, and foreign languages." *Carijano*, 643 F.3d at 1224 (citation omitted). "The mere fact that a case involves conduct or plaintiffs from overseas is not enough for dismissal." *Id.*

Given California's significant interest in this action and its obvious connection with this district, both this factor and the factor regarding the cost of resolving a dispute "unrelated" to this forum, should have weighed against dismissal. The District Court erred in holding otherwise.

### 3.3.4. The factor of court congestion weighs against dismissal

The District Court found that the factor of court congestion favors dismissal because "statistics … clearly show that trial would likely be speedier in the U.K." 1-ER-28.

However, the District Court's analysis of relative speed was flawed. First, the District Court compared statistics for the Central District of California with statistics for the courts of England. These data provide no indication about the court congestion in, for example, London or any other English court where litigation would actually occur. Then, the District Court weighed the median time from filing **to trial** in California in 2019 (21.8 months) against the median time from filing **to final disposition** in England (59 weeks/15 months). 3-ER-438–440; 2-ER-198–210. That is effectively comparing apples and oranges. When only 2% of civil cases go to trial in California, **the relevant statistic is the median time from filing to disposition** *for this forum also* (5.2 months). A proper comparison of these statistics, therefore, suggests that, on average, disposition of cases in this district is speedier than in any U.K. court.

Regardless, because many factors affect the speed with which a dispute is resolved other than court congestion, this factor "is afforded little weight in assessing the public interest factors." *In re Air Crash Over the Taiwan Strait on May 25*, 331 F. Supp. 2d 1176, 1203 (C.D. Cal. 2004) (quoting *Gates Learjet Corp. v. Jensen*,

743 F.2d 1325, 1337 (9th Cir. 1984)). To the extent that it was afforded some weight, it should have weighed against dismissal.

### 3.4. Defendants did not establish that the private interest factors favor dismissal

Next, the Court considered these private interest factors: (1) the residence of the parties and witnesses, (2) the forum's convenience to the litigants, (3) access to physical evidence and other sources of proof, (4) whether unwilling witnesses can be compelled to testify, (5) the cost of bringing witnesses to trial, (6) the enforceability of the judgment, and (7) "all other practical problems that make trial of a case easy, expeditious and inexpensive." 1-ER-28. As with the public interest factors, in viewing these factors under an incorrect legal standard, the Court arrived at the erroneous outcome that, on balance, "the private factors favor dismissal." 1-ER-32.

While it correctly analyzed the fourth and fifth factor as weighing against dismissal, its assessment of the other five factors was flawed.

### 3.4.1. Both the residence-of-parties and convenience-to-litigants factors favor Bundy's choice of a California forum because all Defendants are at home in California

Courts generally conclude that a defendant's domicile in the U.S. forum is a significant factor weighing against dismissal. *Carijano*, 643 F.3d at 1229 (citation

omitted) ("In this unusual situation, where the forum resident seeks dismissal, this fact should weigh strongly against dismissal.").

U.S. defendants who argue it is inconvenient for them to litigate in a court right outside their door are usually met with skepticism:

> Courts should be mindful that, just as plaintiffs sometimes choose a forum for forum-shopping reasons, defendants also may move for dismissal under the doctrine of *forum non conveniens* not because of genuine concern with convenience but because of similar forum-shopping reasons. District courts should therefore arm themselves with an appropriate degree of skepticism in assessing whether the defendant has demonstrated genuine inconvenience and a clear preferability of the foreign forum. And the greater the degree to which the plaintiff has chosen a forum where the defendant's witnesses and evidence are to be found, the harder it should be for the defendant to demonstrate inconvenience.

*Iragorri*, 274 F.3d at 75.

The District Court did not arm itself with any skepticism regarding the defendants here. Defendants do not dispute they have their principal place of business here; nor do they dispute that their corporate officers with personal knowledge regarding the infringement, such as John Silva and Joel Bennett, reside here. *See* 3-ER-489–495. Defendants did not even claim that the inconvenience they would allegedly suffer from litigating at home would be so disproportionate to Bundy's convenience that it would equate to oppression, vexation, or harassment. And how could they?

The situation here is similar to *Boosey*. "This is not a circumstance where the plaintiff's choice of forum is motivated by harassment … Indeed, it seems rather more likely that [Defendants'] motion seeks to … complicate the suit, delay it, and render it more expensive." *Boosey & Hawkes Music Publishers v. Walt Disney*, 145 F.3d 481, 492 (2d Cir. 1998). As Justice Doggett sharply noted in *Castro Alfaro*:

> [W]hat is really involved is not convenience but connivance to avoid corporate accountability … the doctrine is favored by multinational defendants because *forum non conveniens* dismissal is often outcome-determinative, effectively defeating the claim and denying the plaintiff recovery … A *forum non conveniens* dismissal is often … a complete victory for the defendant … Empirical data available demonstrate that less than four percent of cases dismissed under the doctrine of *forum non conveniens* ever reach trial in a foreign court. A *forum non conveniens* dismissal usually will end the litigation altogether, effectively excusing any liability of the defendant.

*Dow Chemical Co. v. Castro Alfaro*, 786 S.W.2d 674, 683 (Tex. 1990) (Doggett, J., concurring)).

Since all Defendants reside in California and California is presumptively convenient for Plaintiff since she sued here, the residence-of-parties and convenience-to-litigants factors should have weighed against dismissal. The District Court abused its discretion by holding otherwise.

### 3.4.2. The residence-of-witnesses factor also weighs against dismissal because Defendants failed to identify any U.K. witnesses who are material to their defense and unavailable to the U.S. forum

This Court correctly held that "[its] focus should not rest on the number of witnesses or quantity of evidence in each locale" but that it "should evaluate the materiality and importance of the anticipated evidence and witnesses' testimony and then determine their accessibility and convenience to the forum." 1-ER-28. Yet it erred in its application of this standard.

**First**, regarding the **materiality** of the witnesses' testimony, the Court's entire focus was on the locale of *potential* witnesses in the U.K. relating to copyright ownership, while it discounted the location of all *actual* witnesses with first-hand knowledge about Defendants' misconduct in the U.S., which is the crux of the complaint.

Prompted by Defendants, this Court identified as potential U.K. witnesses, other than Plaintiff: (i) Penguin's senior counsel Nicola Evans, (ii) Georgia Glover, representing the Sayers' Estate, and (iii) unnamed employees at a Live Nation subsidiary in London who are alleged to have information regarding Defendants' misconduct overseas. 1-ER-29.

While Plaintiff has no intention of calling these individuals to testify at trial, it is even harder to understand how their anticipated testimony would be material to Defendants' *defense*. Based on the sworn declarations they have provided (3-ER-

359–376; 3-ER-46–48), both Nicola Evans and Georgia Glover may reasonably be expected to testify that neither Penguin Books nor the Sayers Trustees own the copyright in the Illustration—thereby directly contradicting Defendants' speculation that there may be issues with Bundy's copyright ownership. Similarly, Defendants also did not explain how the testimony of Live Nation employees in the U.K. regarding its own misconduct would be material *to their defense*.

In *Boston Telecomms.* this Court ruled that "the district court abused its discretion in holding that this private interest factor was neutral when [the defendant] provided very little information that would have enabled the district court to understand why various witnesses were material to his defense." *Boston Telecomms.*, 588 F.3d at 1210. In this case, where Defendants similarly neglected to explain how these U.K. residents were material to their defense, the Court did not just find this factor neutral, it even found that it *favored* dismissal. That is odd.

Moreover, this factor also required the Court to consider the U.S. location of *actual* undisputed witnesses with material information about Defendants' misconduct in the U.S. and abroad, such as John Silva and Joel Bennett (3-ER-492–498), as well as the location of Defendants' U.S. vendors and licensees (3-ER-387–391; 2-ER-49–90). It does not appear that their location was given the appropriate weight, if any. Why their testimony was considered less important than that of Defendants' alleged U.K. witnesses is puzzling. As in *Carijano*, Plaintiff's claims

(as well as Defendants' defenses) "turn not [only] on the physical location of the injury but on the mental state of [Defendants'] managers who actually made the business decisions that allegedly resulted in the injury," an element which was found to weigh against dismissal. *Carijano*, 643 F.3d at 1230. And, as in *Carijano*, the location of Defendants' managers and other U.S. witnesses should have weighed against dismissal here.

**Second**, regarding the witnesses' **accessibility** to the local forum, Defendants made no showing of any inconvenience in bringing these people to trial here, should their testimony be required after all. None of these so-called witnesses that are outside Defendants' control were shown to be unavailable to this forum and their cooperation so far suggests otherwise. Moreover, the parties already agreed "that remote testimony via videoconferencing is equivalent to live testimony." CR 21 at 20:8-11. The physical location of witnesses should therefore only be of minimal importance.

**Finally**, the District Court went even further in its Order denying reconsideration when it determined, without any cause, that the U.K. would also be a more convenient forum for witnesses in Germany. 1-ER-13. Not only is this assumption unfounded—convenience rests on more than physical distance—but, more importantly, Defendants did not even identify a single German witness that

would be material, much less unavailable to them. Making this assumption *sua sponte* and factoring it into its analysis was improper.

For all these reasons, the Court's finding that the residence of parties and witnesses *favors* dismissal (1-ER-29) was an abuse of discretion.

### 3.4.3.   The access-to-evidence factor also weighs against dismissal because Defendants did not identify any evidence in the U.K. to which they do not have access

Focusing, once again, almost exclusively on "potential documents from sources located in the U.K. that relate to ownership of the Illustration," the District Court held that the access-to-evidence factor also favored dismissal. 1-ER-30. However, other than vague assumptions, Defendants provided no concrete evidence to establish that there are any such documents to begin with. In fact, the only evidence in the record cuts the other way: Plaintiff provided evidence that the entire Sayers Archive is now located in Illinois (2-ER-163–190) and that Penguin U.K. possesses no documents either that would aid in Defendants' defense (3-ER-359–376).

Further, as for any documents held by Plaintiff or by Live Nation's so-called "U.K. employees," no reasonable argument can be made that these would be difficult to compel or would require reliance on The Hague Convention. The Court should be mindful that "this factor does not turn on the location of the sources of proof, but relative ease of access to the sources." *Beijing iQIYI Sci. & Tech. Co. v. iTalk Glob.*

*Commc'ns, Inc.*, CIVIL No. 6-19-CV-00272-ADA, at *19 (W.D. Tex. Dec. 17, 2019). "[T]he increased speed and ease of travel and communication makes no forum as inconvenient today as it was in 1947, when the Supreme Court decided *Gilbert.*" *Gates Learjet*, 743 F.2d at 1336 (cleaned up).

Plaintiff is convinced that, had Defendants made even the slightest attempt to obtain the documents they claim to need, they would have found no difficulties. In *Neelon v. Bharti*, 596 F. App'x 532, 6 (9th Cir. 2014), the Court of Appeals held that "[by] disregarding the only record evidence on the location of documentary evidence and making a factual finding regarding the location of the documentary evidence not supported by the record, the district court abused its discretion in weighing the evidence." This case is no different. The District Court simply adopted Defendant's speculation that there may be relevant documents in the U.K., without requiring them to establish that such documents exist and that obtaining them would present a challenge.

The District Court not only failed to hold Defendants to their burden of persuasion on this issue, but it also erred in refusing to reconsider this factor after Plaintiff presented new evidence that conclusively settled the alleged "issues" regarding Bundy's copyright ownership (see point 3.2 above). No longer can it be argued that the more material and more important evidence would be in England, much less that it would be difficult, time-consuming, or expensive for Defendants to

obtain. With the ownership issue resolved, it was appropriate to steer the focus back to the evidence of Defendants' infringing conduct in the U.S. and abroad. That some of that evidence may *also* be in the hands of Defendants' U.K. licensees can hardly be considered a factor that favors dismissal. Most of it should already be in the U.S. in the form of contracts, sales reports, and other accounting documents that Defendants receive from their worldwide licensees in the normal course of business. And to the extent that it is not, Defendants cannot credibly contend that obtaining it from their U.K. partners poses any real burden. *See Neuralstem*, 365 F. App'x at 772 (holding that the district court erred in not considering "the fact that most if not all of the documentary evidence located in England is within [the defendant's] control, and thus can be brought to court wherever the forum").

Therefore, a proper analysis under the correct legal standard should have resulted in a finding that this factor weighs against dismissal. The District Court abused its discretion by holding otherwise.

The District Court's reasoning that it sufficiently addressed Bundy's concerns that the evidence she requires is in the U.S. by conditioning the dismissal (1-ER-31) is also flawed.

First, just as "[c]onditions cannot transform an inadequate forum into an adequate one" (*Bk. of Pakistan*, 273 F.3d at 248), conditions are also no substitute for a proper analysis regarding this factor.

Second, the efficacy of the conditions that the District Court imposed is the subject of scrutiny. *See, e.g., Otto Candies*, 963 F.3d at 1353 (questioning "[the] mechanisms, or legal authority, the district court has at its disposal to ensure compliance with the Federal Rules while a dismissed case is being litigated in a foreign court"); *In re Union Carbide Corp. Gas Plant Disaster*, 809 F.2d 195 (2d Cir. 1987) (explaining that a discovery stipulation would be "subject to such approval as may be required of the [foreign] court," and that otherwise "the parties will be limited by the applicable discovery rules of the [foreign] court in which the claims will be pending").

In any event, as the court in *Otto Candies* pointed out, "the efficacy of a return jurisdiction clause depends on a 'herculean conception of [the] plaintiffs' patience, litigiousness, and financial resources.'" *Otto Candies*, 963 F.3d at 1354 (citation omitted). "Some plaintiffs may not have the resources or appetite to refile and start anew in federal court, especially after protracted litigation abroad. That presupposes that the plaintiffs even had the resources to travel to and refile in the foreign court in the first place." *Id. See also* Martin Davies, *Time to Change the Federal Forum Non Conveniens Analysis*, 77 Tul. L. Rev. 309, 319 (2002) (explaining that "few plaintiffs even bother to pursue their claim in the alternative foreign forum following forum non conveniens dismissal from a U.S. court.").

Considering these obstacles, it is readily apparent that conditioning a dismissal in the way the District Court did may create more problems than it solves. Regardless, the District Court erred in finding that this factor favors dismissal.

### 3.4.4. The district court erred that the enforceability-of-judgment factor favors dismissal because it is always more complex to enforce a foreign judgment against a U.S. defendant than a U.S. judgment

Equally puzzling is the District Court's finding that "enforceability of judgment" favors dismissal. 1-ER-32. Defendants do not claim to have any assets in England that are subject to execution and from which a judgment could be collected, nor do they dispute that Plaintiff would need to turn to U.S. courts for actual relief.

Turning a foreign-country judgment into actual relief involves two steps: (i) recognition and (ii) enforcement. The United States is not a party to any international treaties about the recognition of foreign-country judgments, and the only body of U.S. law is that applied by the states. In California, recognition is governed by the Uniform Foreign-Country Money Judgments Recognition Act ("UFCMJRA"), enacted in Cal. Code Civ. Proc. §§ 1713-1725. Once recognized, a foreign-country judgment is treated like a domestic judgment, and becomes enforceable under California's Enforcement of Judgments Law, enacted in Cal. Code Civ. Proc. §§ 680.010-724.260.

The first problem that Bundy would face in trying to enforce her English judgment in California is that it requires the filing of a new action in a California court. *See* Cal. Code Civ. Proc. §1718 ("If recognition of a foreign-country judgment is sought as an original matter, the issue of recognition shall be raised by filing an action seeking recognition of the foreign-country judgment."). This is certainly more complicated and costly than enforcing a California judgment against a California defendant. *See Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1134, 1152 (C.D. Cal. 2005) ("As the Defendant in the current action is an American company, it would be easier for a United States court to enforce a potential judgment against them than a Colombian court. Thus, this factor favors Plaintiffs."). For this reason alone, the enforceability-of-judgment factor can never *favor* dismissal.

Second, the UFCMJRA does not cover judgments for relief other than for monetary damages; it does not cover injunctive relief. Yet, the District Court dismissed that concern on the grounds that (a) Defendants alleged that there was no more infringing conduct to be enjoined, and that (b) "neither party cited authority in which an English injunction was sought to be enforced in California." 1-ER-31–32.

Plaintiff respectfully requested the District Court to reconsider its analysis of this factor because both of those findings constitute error. Not only did Plaintiff present evidence that third parties are still selling infringing products to Defendants' benefit (2-ER-49–90), and that an injunction is thus still warranted, the District Court

erroneously shifted the burden onto Plaintiff to cite authority in which an English injunction was *not* enforced in California, while, superfluously, the burden was on Defendants to cite authority in which it was. And they did not.

The District Court declined to reconsider, nonetheless. Instead, it substituted Defendants' burden with its own argument that Cal. Civ. Proc. Code § 1723 "does not prevent the recognition under principles of comity or otherwise of a foreign-country judgment not within the scope of this chapter." The District Court even did its own research and found case law—which it admits is not "directly on point" but which it still believes to be "instructive"—to support its view that "an injunction ordered by a foreign court could be enforceable in California so long as the injunction was not inconsistent with American law or repugnant to public policy." 1-ER-13–14 (emphasis added). Aside from the fact that *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199 (9th Cir. 2006) really is not on point,[4] the use of the word "could" merely underscores Plaintiff's point—that there are no guarantees that it actually *would* be enforceable here. Even if Bundy were able to enforce her U.K. injunction against the U.S. Defendants in California, it would be an uncertain, complicated, time-consuming, and costly endeavor. So, for

---

[4] If anything, *Yahoo!* confirms that there is very little case law about the enforceability of foreign country injunctions in California under general principles of comity, and that in the only case in which a California court has ruled on the issue, it declined to order enforcement. *Yahoo!*, 433 F.3d at 1214.

this reason also, the enforceability-of-judgment factor should weigh against dismissal.

### 3.4.5. The District Court erred to find the seventh factor neutral when it failed to consider Plaintiff's "other practical problems and other facts that contribute to an efficient resolution".

Finally, the District Court's analysis of the private interest factors was erroneous because it was incomplete. While Plaintiff clearly identified two other barriers to litigation in England—(i) her jurisdictional inability to join additional U.S. infringers and (ii) her financial inability to afford English counsel and American experts to advise a U.K. court on U.S. law—the District Court ignored both concerns and found the seventh factor to be neutral. 1-ER-32. Even on reconsideration, the District Court still refused to accord these problems any weight. This was an abuse of discretion.

First, as for Plaintiff's inability to join additional U.S. infringers in a U.K. suit, the District Court did not address this problem at all in its original analysis. 1-ER-32. Worse yet, even after being asked to correct itself, the District Court still "decline[d] to reconsider its Order on the basis of potential additional infringers that Bundy may or may not identify." 1-ER-15. Plaintiff offered evidence of numerous companies selling infringing merchandise in the U.S. that claim to be "officially licensed" by the named Defendants in this case. 3-ER-387–391, 2-ER-49–90. So,

these companies are not "potential" infringers, let alone unidentified. Moreover, as Plaintiff argued in the proceedings below, discovery will reveal other U.S. vendors and licensees she may want to join. Those parties are not subject to personal jurisdiction in England, and they are unlikely to voluntarily appear there—as a party *or* witness.

In *Piper Aircraft*, the Court justified dismissal because "potential third-party defendants" could not be made to appear in a U.S. court. *Piper Aircraft* 454 U.S. at 259. Here, the opposite problem exists: these U.S. infringers cannot be compelled to appear in an English court. As such, this factor should have weighed against dismissal and the District Court abused its discretion by not considering it at all.

Second, relying on *Murray v. British Broadcasting Corporation*, 81 F .3d 287, 294 (2d Cir. 1996), the District Court held that "the unavailability of contingent fee arrangements in England is of little weight." 1-ER-14–15. This is inaccurate; the court in Murray found it to be "of little weight *in the present matter*." *Id.* at 293 (emphasis added). The facts in *Murray* differ significantly from this case. In *Murray*, the crux of the matter involved "a dispute between British citizens over events that took place exclusively in the United Kingdom" and that mainly concerned issues governed by British contract law. *Id.* at 293. As such, the Court found that "[t]he United States thus has virtually no interest in resolving the truly disputed issues." *Id.* at 293. In contrast, *this* action concerns misconduct in the U.S. by American

55

companies in violation of U.S. laws. As such, the connection of this case to the U.S. is strong and any U.K. interest bleaks in comparison.

Even more pertinent, Murray's argument was not—as here—that the unavailability of contingent fee arrangements is a private interest factor that weighs against dismissal. Instead, Murray argued that his financial hardship to litigate this dispute in England "render[ed] the English forum unavailable as a matter of law." *Id.* 292. While the court in *Murray* correctly found that "[a] claim of financial hardship may not be considered in determining the availability of an alternative forum," it confirmed that it is a factor that must be balanced to assess the forum's convenience." *Id.* at 292-293. *Murray* is not an outlier. Many courts have held that "a plaintiff's financial burdens, including hardships resulting from the absence of contingent fee arrangements, should be considered as one of the *Gilbert* factors … after a court determines that an alternative forum is available." *Byrne*, 132 F. Supp. 2d at 237. *See, e.g., In re Air Crash Over the Taiwan Strait*, 331 F. Supp. 2d at 1188 ("Plaintiffs' concerns that they will be unable to find lawyers willing to represent them on a contingent fee basis … are relevant to the second element of the *forum non conveniens* test—i.e., whether public and private interests favor dismissal."); *Yager v. Starwood Hotels & Resorts Worldwide, Inc.*, CIVIL ACTION No. 12-4789, at *12 (E.D. Pa. June 3, 2013) (citations omitted) ("As part of the private interest analysis, the Court should consider 'the plaintiff's position, financial and otherwise,

and his or her ability as a practical matter to bring suit in the alternative forum.' …

Due to the absence of contingency fee arrangements and the financial burden this would impose on Plaintiffs, this factor weighs in favor of Plaintiffs."); *In re Air Crash Crash off Long Island, N.Y.*, 65 F. Supp. 2d 207 (S.D.N.Y. 1999) ("the absence of contingent fee arrangements in a foreign jurisdiction is a permissible factor to weigh in the *forum non conveniens* analysis.").

Defendants do not show otherwise. Therefore, even if this factor would only be of "little" weight, the District Court abused its discretion by not giving it any weight.[5]

Finally, Defendants do not dispute that it is cost-prohibitive for Bundy to litigate this case in England. In fact, they count on it. There is little reason for American defendants to seek trial in a forum thousands of miles away other than to impose an oppressive burden on their opponent. Defendants' motion to dismiss for *forum non conveniens* is a prime example of "reverse forum-shopping" where affluent Defendants spend substantial resources on this motion with the sole purpose of avoiding liability altogether.

---

[5] The District Court cited *In re Air Crash at Madrid, Spain, on August 20, 2008*, 893 F. Supp. 2d 1020 (C.D. Cal. 2011) for the proposition that "the unavailability of contingency fee arrangements and the fee shifting system in Spain did not weigh against dismissal." 1-ER-15. However, this is overly simplistic. Even in that case, the court *did* consider this factor and decided that, *there*, it did not deserve "substantial weight" and "weigh[ed] at most only slightly against dismissal."

Whatever Defendants' motives, it is well-settled that "[t]he court must be alert to the realities of the plaintiff's position, financial and otherwise, and his or her ability as a practical matter to bring suit in the alternative forum." *Lehman v. Humphrey Cayman, Ltd.*, 713 F.2d 339, 346 (8th Cir. 1983). "It is almost a perversion of the *forum non conveniens* doctrine to remit a plaintiff, in the name of expediency, to a forum in which, realistically, it will be unable to bring suit when the defendant would not be genuinely prejudiced by having to defend at home in the plaintiff's chosen forum." *Manu International*, 641 F.2d at 67. So, if the ultimate inquiry is where trial will best serve the parties' convenience and the ends of justice, sustaining dismissal of this action in favor of Defendants can only prompt these questions: "who's convenience?" and "who's justice?".

## 4. This Case Should Be Reassigned on Remand

Plaintiffs request that this court exercise its supervisory power under 28 U.S.C. § 2106 to reassign this case to a different district court judge on remand. "Remand to a different judge is not the usual remedy when error is found in district court proceedings." *United States v. Arnett*, 628 F.2d 1162, 1165 (9th Cir. 1979). In the ordinary course,

> Absent allegations of bias, the factors this court considers in deciding whether "unusual circumstances" exist and remand to a different judge is appropriate are: (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in

> putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Living Designs, Inc. v. E.I. Dupont De Nemours and Co.*, 431 F.3d 353, 372-73 (9th Cir. 2005) (citations omitted). "A finding of either the first or second factor supports remanding to a different district court judge. *Id.*

The Ninth Circuit has reassigned cases based upon the "appearance of justice" in situations where "the district court's expressions of frustration with an attorney or party somehow *appeared* to affect his or her handling of the substantive issues in the case." *State of Cal. v. Montrose Chem. Corp. of California*, 104 F.3d 1507, 1522 (9th Cir. 1997) (emphasis in original).

These factors warrant reassignment in this case to preserve the appearance of justice. In its original Order granting dismissal, the District Court made several legal and factual errors that it was respectfully asked to address on reconsideration. It declined the opportunity to do so, without much of an explanation other than unwillingness, which allowed these errors to stand. In addition, the District Court made several statements that suggest it has already formed an opinion about the parties and the merits of this case. For example, on reconsideration, the District Court expressed the views that Bundy "is putting the cart before the horse" and "seems to misinterpret or otherwise overestimate her ability to state a claim for

copyright infringement under U.S. law." Also unwarranted—because completely unfounded—was the District Court's skepticism about Plaintiff's motives for suing here and about her counsel's sworn statement that the evidence filed with Bundy's motion for reconsideration was newly-discovered. Logic dictates that, if Bundy had been able to obtain that evidence before, she would have filed it with her opposition to Defendant's motion to dismiss.

These views, along with the district court's seeming frustration, certainly drove the erroneous outcome of this *forum non conveniens* analysis. Chances are they will also permeate the court's handling of the substantive issues of this case.

In addition, the District Court has expressed great reluctance to apply foreign copyright law. Justice would be better served by having this case reassigned to a judge who feels more comfortable doing so.

The interest of judicial efficiency does not outweigh concerns for the appearance of fairness in this case. The District Court has not yet had to consider the merits, no hearings have occurred, and litigation is in its infancy.

# CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court reverse the District Court's Orders and Judgment, remand the action for further proceedings

consistent with Ninth Circuit law, and reassign this case to a different trial judge on remand.

Dated: June 17, 2022        MODO LAW, P.C.

s/ Inge De Bruyn

Inge De Bruyn
4218 Via Padova
Claremont, CA 91711
Telephone: (323) 983-2188
Email: inge.debruyn@modo-law.com

*Attorney for Plaintiff-Appellant*
*Jocelyn Susan Bundy*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**  | 21-56305 |

I am the attorney or self-represented party.

**This brief contains** | 13,912 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

  ○ it is a joint brief submitted by separately represented parties;

  ○ a party or parties are filing a single brief in response to multiple briefs; or

  ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated | | .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Inge De Bruyn |   **Date** | 06/17/2022 |

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8**                                          *Rev. 12/01/2018*

# ADDENDUM
# <u>TABLE OF CONTENTS</u>

| Tab | Description |
| --- | --- |
| 1. | 17 U.S.C. § 101 |
| 2. | 17 U.S.C. § 104A |
| 3. | 17 U.S.C. § 201 |
| 4. | 17 U.S.C. § 501 |
| 5. | 17 U.S.C. § 1202 |
| 6. | 28 U.S.C. § 1291 |
| 7. | 28 U.S.C. § 1331 |
| 8. | 28 U.S.C. § 1367(a) |
| 9. | 28 U.S.C. § 2106 |
| 10. | Cal. Code Civ. Proc. § 1715 |
| 11. | Cal. Code Civ. Proc. § 1718 |
| 12. | Cal. Civ. Proc. Code § 1723 |

# TAB 1

# 17 U.S.C. § 101

## Definitions

For purposes of section 411, a work is a "United States work" only if-

**(1)** in the case of a published work, the work is first published-

    **(A)** in the United States;

    **(B)** simultaneously in the United States and another treaty party or parties, whose law grants a term of copyright protection that is the same as or longer than the term provided in the United States;

    **(C)** simultaneously in the United States and a foreign nation that is not a treaty party; or

    **(D)** in a foreign nation that is not a treaty party, and all of the authors of the work are nationals, domiciliaries, or habitual residents of, or in the case of an audiovisual work legal entities with headquarters in, the United States;

**(2)** in the case of an unpublished work, all the authors of the work are nationals, domiciliaries, or habitual residents of the United States, or, in the case of an unpublished audiovisual work, all the authors are legal entities with headquarters in the United States; or

**(3)** in the case of a pictorial, graphic, or sculptural work incorporated in a building or structure, the building or structure is located in the United States.

A "useful article" is an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information. An article that is normally a part of a useful article is considered a "useful article".

# TAB 2

# 17 U.S.C. § 104A

Section 104A - Copyright in restored works

**(a)** AUTOMATIC PROTECTION AND TERM.-

**(1)** TERM.-

**(A)** Copyright subsists, in accordance with this section, in restored works, and vests automatically on the date of restoration.

**(B)** Any work in which copyright is restored under this section shall subsist for the remainder of the term of copyright that the work would have otherwise been granted in the United States if the work never entered the public domain in the United States.

**(2)** EXCEPTION.-Any work in which the copyright was ever owned or administered by the Alien Property Custodian and in which the restored copyright would be owned by a government or instrumentality thereof, is not a restored work.

**(b)** OWNERSHIP OF RESTORED COPYRIGHT.-A restored work vests initially in the author or initial rightholder of the work as determined by the law of the source country of the work.

**(c)** FILING OF NOTICE OF INTENT TO ENFORCE RESTORED COPYRIGHT AGAINST RELIANCE PARTIES.-On or after the date of restoration, any person who owns a copyright in a restored work or an exclusive right therein may file with the Copyright Office a notice of intent to enforce that person's copyright or exclusive right or may serve such a notice directly on a reliance party. Acceptance of a notice by the Copyright Office is effective as to any reliance parties but shall not create a presumption of the validity of any of the facts stated therein. Service on a reliance party is effective as to that reliance party and any other reliance parties with actual knowledge of such service and of the contents of that notice.

**(d)** REMEDIES FOR INFRINGEMENT OF RESTORED COPYRIGHTS.-

**(1)** ENFORCEMENT OF COPYRIGHT IN RESTORED WORKS IN THE ABSENCE OF A RELIANCE PARTY.-As against any party who is not a reliance party, the remedies provided in chapter 5 of this title shall be available on or after the date of restoration of a restored copyright with respect to an act of infringement of the restored copyright that is commenced on or after the date of restoration.

**(2)** ENFORCEMENT OF COPYRIGHT IN RESTORED WORKS AS AGAINST RELIANCE PARTIES.-As against a reliance party, except to the extent provided in paragraphs (3) and (4), the remedies provided in chapter 5 of this title shall be available, with respect to an act of infringement of a restored copyright, on or after the date of restoration of the restored copyright if the requirements of either of the following subparagraphs are met:

**(A)**

**(i)** The owner of the restored copyright (or such owner's agent) or the owner of an exclusive right therein (or such owner's agent) files with the Copyright Office, during

the 24-month period beginning on the date of restoration, a notice of intent to enforce the restored copyright; and

**(ii)**

**(I)** the act of infringement commenced after the end of the 12-month period beginning on the date of publication of the notice in the Federal Register;

**(II)** the act of infringement commenced before the end of the 12-month period described in subclause (I) and continued after the end of that 12-month period, in which case remedies shall be available only for infringement occurring after the end of that 12-month period; or

**(III)** copies or phonorecords of a work in which copyright has been restored under this section are made after publication of the notice of intent in the Federal Register.

**(B)**

**(i)** The owner of the restored copyright (or such owner's agent) or the owner of an exclusive right therein (or such owner's agent) serves upon a reliance party a notice of intent to enforce a restored copyright; and

**(ii)**

**(I)** the act of infringement commenced after the end of the 12-month period beginning on the date the notice of intent is received;

**(II)** the act of infringement commenced before the end of the 12-month period described in subclause (I) and continued after the end of that 12-month period, in which case remedies shall be available only for the infringement occurring after the end of that 12-month period; or

**(III)** copies or phonorecords of a work in which copyright has been restored under this section are made after receipt of the notice of intent.
In the event that notice is provided under both subparagraphs (A) and (B), the 12-month period referred to in such subparagraphs shall run from the earlier of publication or service of notice.

**(3)** EXISTING DERIVATIVE WORKS.-
  **(A)** In the case of a derivative work that is based upon a restored work and is created-
    **(i)** before the date of the enactment of the Uruguay Round Agreements Act, if the source country of the restored work is an eligible country on such date, or

    **(ii)** before the date on which the source country of the restored work becomes an eligible country, if that country is not an eligible country on such date of enactment, a reliance party may continue to exploit that derivative work for the duration of the restored copyright if the reliance party pays to the owner of the restored copyright reasonable compensation for conduct which would be subject to a remedy for infringement but for the provisions of this paragraph.



(B) In the absence of an agreement between the parties, the amount of such compensation shall be determined by an action in United States district court, and shall reflect any harm to the actual or potential market for or value of the restored work from the reliance party's continued exploitation of the work, as well as compensation for the relative contributions of expression of the author of the restored work and the reliance party to the derivative work.

(4) COMMENCEMENT OF INFRINGEMENT FOR RELIANCE PARTIES.-For purposes of section 412, in the case of reliance parties, infringement shall be deemed to have commenced before registration when acts which would have constituted infringement had the restored work been subject to copyright were commenced before the date of restoration.

(e) NOTICES OF INTENT TO ENFORCE A RESTORED COPYRIGHT.-

(1) NOTICES OF INTENT FILED WITH THE COPYRIGHT OFFICE.-

(A)

(i) A notice of intent filed with the Copyright Office to enforce a restored copyright shall be signed by the owner of the restored copyright or the owner of an exclusive right therein, who files the notice under subsection (d)(2)(A)(i) (hereafter in this paragraph referred to as the "owner"), or by the owner's agent, shall identify the title of the restored work, and shall include an English translation of the title and any other alternative titles known to the owner by which the restored work may be identified, and an address and telephone number at which the owner may be contacted. If the notice is signed by an agent, the agency relationship must have been constituted in a writing signed by the owner before the filing of the notice. The Copyright Office may specifically require in regulations other information to be included in the notice, but failure to provide such other information shall not invalidate the notice or be a basis for refusal to list the restored work in the Federal Register.

(ii) If a work in which copyright is restored has no formal title, it shall be described in the notice of intent in detail sufficient to identify it.

(iii) Minor errors or omissions may be corrected by further notice at any time after the notice of intent is filed. Notices of corrections for such minor errors or omissions shall be accepted after the period established in subsection (d)(2)(A)(i). Notices shall be published in the Federal Register pursuant to subparagraph (B).

(B)

(i) The Register of Copyrights shall publish in the Federal Register, commencing not later than 4 months after the date of restoration for a particular nation and every 4 months thereafter for a period of 2 years, lists identifying restored works and the ownership thereof if a notice of intent to enforce a restored copyright has been filed.

(ii) Not less than 1 list containing all notices of intent to enforce shall be maintained in the Public Information Office of the Copyright Office and shall be available for public inspection and copying during regular business hours pursuant to sections 705 and 708.



**(C)** The Register of Copyrights is authorized to fix reasonable fees based on the costs of receipt, processing, recording, and publication of notices of intent to enforce a restored copyright and corrections thereto.

**(D)**

**(i)** Not later than 90 days before the date the Agreement on Trade-Related Aspects of Intellectual Property referred to in section 101(d)(15) of the Uruguay Round Agreements Act enters into force with respect to the United States, the Copyright Office shall issue and publish in the Federal Register regulations governing the filing under this subsection of notices of intent to enforce a restored copyright.

**(ii)** Such regulations shall permit owners of restored copyrights to file simultaneously for registration of the restored copyright.

**(2)** NOTICES OF INTENT SERVED ON A RELIANCE PARTY.-

**(A)** Notices of intent to enforce a restored copyright may be served on a reliance party at any time after the date of restoration of the restored copyright.

**(B)** Notices of intent to enforce a restored copyright served on a reliance party shall be signed by the owner or the owner's agent, shall identify the restored work and the work in which the restored work is used, if any, in detail sufficient to identify them, and shall include an English translation of the title, any other alternative titles known to the owner by which the work may be identified, the use or uses to which the owner objects, and an address and telephone number at which the reliance party may contact the owner. If the notice is signed by an agent, the agency relationship must have been constituted in writing and signed by the owner before service of the notice.

**(3)** EFFECT OF MATERIAL FALSE STATEMENTS.-Any material false statement knowingly made with respect to any restored copyright identified in any notice of intent shall make void all claims and assertions made with respect to such restored copyright.

**(f)** IMMUNITY FROM WARRANTY AND RELATED LIABILITY.-

**(1)** IN GENERAL.-Any person who warrants, promises, or guarantees that a work does not violate an exclusive right granted in section 106 shall not be liable for legal, equitable, arbitral, or administrative relief if the warranty, promise, or guarantee is breached by virtue of the restoration of copyright under this section, if such warranty, promise, or guarantee is made before January 1, 1995.

**(2)** PERFORMANCES.-No person shall be required to perform any act if such performance is made infringing by virtue of the restoration of copyright under the provisions of this section, if the obligation to perform was undertaken before January 1, 1995.

**(g)** PROCLAMATION OF COPYRIGHT RESTORATION.-Whenever the President finds that a particular foreign nation extends, to works by authors who are nationals or domiciliaries of the United States, restored copyright protection on substantially the same

basis as provided under this section, the President may by proclamation extend restored protection provided under this section to any work-

**(1)** of which one or more of the authors is, on the date of first publication, a national, domiciliary, or sovereign authority of that nation; or

**(2)** which was first published in that nation.

The President may revise, suspend, or revoke any such proclamation or impose any conditions or limitations on protection under such a proclamation.

**(h)** DEFINITIONS.-For purposes of this section and section 109(a):

**(1)** The term "date of adherence or proclamation" means the earlier of the date on which a foreign nation which, as of the date the WTO Agreement enters into force with respect to the United States, is not a nation adhering to the Berne Convention or a WTO member country, becomes-

**(A)** a nation adhering to the Berne Convention;

**(B)** a WTO member country;

**(C)** a nation adhering to the WIPO Copyright Treaty;

**(D)** a nation adhering to the WIPO Performances and Phonograms Treaty; or

**(E)** subject to a Presidential proclamation under subsection (g).

**(2)** The "date of restoration" of a restored copyright is-

**(A)** January 1, 1996, if the source country of the restored work is a nation adhering to the Berne Convention or a WTO member country on such date, or

**(B)** the date of adherence or proclamation, in the case of any other source country of the restored work.

**(3)** The term "eligible country" means a nation, other than the United States, that-

**(A)** becomes a WTO member country after the date of the enactment of the Uruguay Round Agreements Act;

**(B)** on such date of enactment is, or after such date of enactment becomes, a nation adhering to the Berne Convention;

**(C)** adheres to the WIPO Copyright Treaty;

**(D)** adheres to the WIPO Performances and Phonograms Treaty; or

**(E)** after such date of enactment becomes subject to a proclamation under subsection (g).

**(4)** The term "reliance party" means any person who-

**(A)** with respect to a particular work, engages in acts, before the source country of that work becomes an eligible country, which would have violated section 106 if the restored



work had been subject to copyright protection, and who, after the source country becomes an eligible country, continues to engage in such acts;

**(B)** before the source country of a particular work becomes an eligible country, makes or acquires 1 or more copies or phonorecords of that work; or

**(C)** as the result of the sale or other disposition of a derivative work covered under subsection (d)(3), or significant assets of a person described in subparagraph (A) or (B), is a successor, assignee, or licensee of that person.

**(5)** The term "restored copyright" means copyright in a restored work under this section.

**(6)** The term "restored work" means an original work of authorship that-
   **(A)** is protected under subsection (a);

   **(B)** is not in the public domain in its source country through expiration of term of protection;

   **(C)** is in the public domain in the United States due to-
      **(i)** noncompliance with formalities imposed at any time by United States copyright law, including failure of renewal, lack of proper notice, or failure to comply with any manufacturing requirements;

      **(ii)** lack of subject matter protection in the case of sound recordings fixed before February 15, 1972; or

      **(iii)** lack of national eligibility;

   **(D)** has at least one author or rightholder who was, at the time the work was created, a national or domiciliary of an eligible country, and if published, was first published in an eligible country and not published in the United States during the 30-day period following publication in such eligible country; and

   **(E)** if the source country for the work is an eligible country solely by virtue of its adherence to the WIPO Performances and Phonograms Treaty, is a sound recording.

**(7)** The term "rightholder" means the person-
   **(A)** who, with respect to a sound recording, first fixes a sound recording with authorization, or

   **(B)** who has acquired rights from the person described in subparagraph (A) by means of any conveyance or by operation of law.

**(8)** The "source country" of a restored work is-
   **(A)** a nation other than the United States;

   **(B)** in the case of an unpublished work-
      **(i)** the eligible country in which the author or rightholder is a national or domiciliary, or, if a restored work has more than 1 author or rightholder, of which the majority of



foreign authors or rightholders are nationals or domiciliaries; or

**(ii)** if the majority of authors or rightholders are not foreign, the nation other than the United States which has the most significant contacts with the work; and

**(C)** in the case of a published work-
**(i)** the eligible country in which the work is first published, or

**(ii)** if the restored work is published on the same day in 2 or more eligible countries, the eligible country which has the most significant contacts with the work.

*17 U.S.C. § 104A*

Added Pub. L. 103-182, title III, §334(a), Dec. 8, 1993, 107 Stat. 2115; amended Pub. L. 103-465, title V, §514(a), Dec. 8, 1994, 108 Stat. 4976; Pub. L. 104-295, §20(e)(2), Oct. 11, 1996, 110 Stat. 3529; Pub. L. 105-80, §2, Nov. 13, 1997, 111 Stat. 1530; Pub. L. 105-304, title I, §102(c), Oct. 28, 1998, 112 Stat. 2862.

**EDITORIAL NOTES**

**REFERENCES IN TEXT** *The date of the enactment of the Uruguay Round Agreements Act, referred to in subsecs. (d)(3)(A) and (h)(3), is the date of enactment of Pub. L. 103-465 which was approved Dec. 8, 1994.Section 101(d)(15) of the Uruguay Round Agreements Act, referred to in subsec. (e)(1)(D)(i), is classified to section 3511(d)(15) of Title 19, Customs Duties.*

**AMENDMENTS1998**-*Subsec. (h)(1)(A) to (E). Pub. L. 105-304, §102(c)(1), added subpars. (A) to (E) and struck out former subpars. (A) and (B) which read as follows:"(A) a nation adhering to the Berne Convention or a WTO member country; or"(B) subject to a Presidential proclamation under subsection (g)."Subsec. (h)(3). Pub. L. 105-304, §102(c)(2), amended par. (3) generally. Prior to amendment, par. (3) read as follows: "The term 'eligible country' means a nation, other than the United States, that-"(A) becomes a WTO member country after the date of the enactment of the Uruguay Round Agreements Act;"(B) on such date of enactment is, or after such date of enactment becomes, a member of the Berne Convention; or"(C) after such date of enactment becomes subject to a proclamation under subsection (g).For purposes of this section, a nation that is a member of the Berne Convention on the date of the enactment of the Uruguay Round Agreements Act shall be construed to become an eligible country on such date of enactment."Subsec. (h)(6)(E). Pub. L. 105-304, §102(c)(3), added subpar. (E).Subsec. (h)(8)(B)(i). Pub. L. 105-304, §102(c)(4), inserted "of which" before "the majority" and struck out "of eligible countries" after "domiciliaries".Subsec. (h)(9). Pub. L. 105-304, §102(c)(5), struck out par. (9) which read as follows: "The terms 'WTO Agreement' and 'WTO member country' have the meanings given those terms in paragraphs (9) and (10), respectively, of section 2 of the Uruguay Round Agreements Act."**1997**-Subsec. (d)(3) (A). Pub. L. 105-80, §2(1), amended subpar. (A) generally. Prior to amendment, subpar. (A) read as follows: "In the case of a derivative work that is based upon a restored work and is created-"(i) before the date of the enactment of the Uruguay Round Agreements Act, if the source country of the derivative work is an eligible country on such date, or"(ii) before the date of adherence or proclamation, if the source country of the derivative work is not an eligible country on such date of enactment,a reliance party may continue to exploit that work for the duration of the restored copyright if the reliance party pays to the owner of the restored copyright reasonable compensation for conduct which would be subject to a remedy for infringement but for the provisions of this paragraph."Subsec. (e)(1)(B)(ii). Pub. L. 105-80, §2(2), struck out at end "Such list shall also be published in the Federal Register on an annual basis for the first 2 years after the applicable date of restoration."Subsec. (h)(2), (3). Pub. L. 105-80, §2(3), (4), amended pars. (2) and (3) generally. Prior to amendment, pars. (2) and (3) read as*

follows:"(2) The 'date of restoration' of a restored copyright is the later of-"(A) the date on which the Agreement on Trade-Related Aspects of Intellectual Property referred to in section 101(d)(15) of the Uruguay Round Agreements Act enters into force with respect to the United States, if the source country of the restored work is a nation adhering to the Berne Convention or a WTO member country on such date; or"(B) the date of adherence or proclamation, in the case of any other source country of the restored work."(3) The term 'eligible country' means a nation, other than the United States, that is a WTO member country, adheres to the Berne Convention, or is subject to a proclamation under subsection (g)."**1996**-Subsec. (h)(3). Pub. L. 104-295 substituted "subsection (g)" for "section 104A(g)".**1994**- Pub. L. 103-465 substituted "Copyright in restored works" for "Copyright in certain motion pictures" as section catchline and amended text generally, substituting present provisions for provisions restoring copyright in certain motion pictures and providing for effective date of protection as well as use of previously owned copies.

### STATUTORY NOTES AND RELATED SUBSIDIARIES

**EFFECTIVE DATE OF 1998 AMENDMENT**Subsec. (h)(1)(A), (B), (E), (3)(A), (B), (E) of this section and amendment by section 102(c)(4), (5) of Pub. L. 105-304 effective Oct. 28, 1998, except as otherwise provided, subsec. (h)(1)(C), (3)(C) of this section effective Mar. 6, 2002, and subsec. (h)(1)(D), (3)(D) of this section and amendment by section 102(c)(3) of Pub. L. 105-304 effective May 20, 2002, see section 105(a), (b)(1)(C), (D), (2)(D)-(F) of Pub. L. 105-304 set out as a note under section 101 of this title.

**EFFECTIVE DATE**Section effective on the date the North American Free Trade Agreement enters into force with respect to the United States (Jan. 1, 1994), see section 335(a) of Pub. L. 103-182 formerly set out in an Effective Date of 1993 Amendment note under section 1052 of Title 15, Commerce and Trade.

### EXECUTIVE DOCUMENTS

**URUGUAY ROUND AGREEMENTS: ENTRY INTO FORCE**The Uruguay Round Agreements, including the World Trade Organization Agreement and agreements annexed to that Agreement, as referred to in section 3511(d) of Title 19, Customs Duties, entered into force with respect to the United States on Jan. 1, 1995. See note set out under section 3511 of Title 19.



# TAB 3

# 17 U.S.C. § 201

Section 201 - Ownership of copyright

**(a)** INITIAL OWNERSHIP.-Copyright in a work protected under this title vests initially in the author or authors of the work. The authors of a joint work are coowners of copyright in the work.

**(b)** WORKS MADE FOR HIRE.-In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.

**(c)** CONTRIBUTIONS TO COLLECTIVE WORKS.-Copyright in each separate contribution to a collective work is distinct from copyright in the collective work as a whole, and vests initially in the author of the contribution. In the absence of an express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series.

**(d)** TRANSFER OF OWNERSHIP.-

**(1)** The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession.

**(2)** Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by clause (1) and owned separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title.

**(e)** INVOLUNTARY TRANSFER.-When an individual author's ownership of a copyright, or of any of the exclusive rights under a copyright, has not previously been transferred voluntarily by that individual author, no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under a copyright, shall be given effect under this title, except as provided under title 11.

*17 U.S.C. § 201*

Pub. L. 94-553, title I, §101, Oct. 19, 1976, 90 Stat. 2568; Pub. L. 95-598, title III, §313, Nov. 6, 1978, 92 Stat. 2676.

**HISTORICAL AND REVISION NOTES**

*HOUSE REPORT NO. 94-1476Initial Ownership. Two basic and well-established principles of copyright law are restated in section 201(a): that the source of copyright ownership is the author of the work, and that, in the case of a "joint work," the coauthors of the work are likewise coowners of the copyright. Under the definition of section 101, a work is "joint" if the authors collaborated with each other, or if each of the authors prepared his or her contribution with the knowledge and intention that it would be merged with the contributions of other authors*

 casetext

1

as "inseparable or interdependent parts of a unitary whole." The touchstone here is the intention, at the time the writing is done, that the parts be absorbed or combined into an integrated unit, although the parts themselves may be either "inseparable" (as the case of a novel or painting) or "interdependent" (as in the case of a motion picture, opera, or the words and music of a song). The definition of "joint work" is to be contrasted with the definition of "collective work," also in section 101, in which the elements of merger and unity are lacking; there the key elements are assemblage or gathering of "separate and independent works * * * into a collective whole."The definition of "joint works" has prompted some concern lest it be construed as converting the authors of previously written works, such as plays, novels, and music, into coauthors of a motion picture in which their work is incorporated. It is true that a motion picture would normally be a joint rather than a collective work with respect to those authors who actually work on the film, although their usual status as employees for hire would keep the question of coownership from coming up. On the other hand, although a novelist, playwright, or songwriter may write a work with the hope or expectation that it will be used in a motion picture, this is clearly a case of separate or independent authorship rather than one where the basic intention behind the writing of the work was for motion picture use. In this case, the motion picture is a derivative work within the definition of that term, and section 103 makes plain that copyright in a derivative work is independent of, and does not enlarge the scope of rights in, any preexisting material incorporated in it. There is thus no need to spell this conclusion out in the definition of "joint work."There is also no need for a specific statutory provision concerning the rights and duties of the coowners of a work; court-made law on this point is left undisturbed. Under the bill, as under the present law, coowners of a copyright would be treated generally as tenants in common, with each coowner having an independent right to use or license the use of a work, subject to a duty of accounting to the other coowners for any profits.**Works Made for Hire.** Section 201(b) of the bill adopts one of the basic principles of the present law: that in the case of works made for hire the employer is considered the author of the work, and is regarded as the initial owner of copyright unless there has been an agreement otherwise. The subsection also requires that any agreement under which the employee is to own rights be in writing and signed by the parties.The work-made-for-hire provisions of this bill represent a carefully balanced compromise, and as such they do not incorporate the amendments proposed by screenwriters and composers for motion pictures. Their proposal was for the recognition of something similar to the "shop right" doctrine of patent law: with some exceptions, the employer would acquire the right to use the employee's work to the extent needed for purposes of his regular business, but the employee would retain all other rights as long as he or she refrained from the authorizing of competing uses. However, while this change might theoretically improve the bargaining position of screenwriters and others as a group, the practical benefits that individual authors would receive are highly conjectural. The presumption that initial ownership rights vest in the employer for hire is well established in American copyright law, and to exchange that for the uncertainties of the shop right doctrine would not only be of dubious value to employers and employees alike, but might also reopen a number of other issues.The status of works prepared on special order or commission was a major issue in the development of the definition of "works made for hire" in section 101, which has undergone extensive revision during the legislative process. The basic problem is how to draw a statutory line between those works written on special order or commission that should be considered as "works made for hire," and those that should not. The definition now provided by the bill represents a compromise which, in effect, spells out those specific categories of commissioned works that can be considered "works made for hire" under certain circumstances.Of these, one of the most important categories is that of "instructional texts." This term is given its own definition in the bill: "a literary, pictorial, or graphic work prepared for publication with the purpose of use in systematic instructional activities." The concept is intended to include what might be loosely called "textbook material," whether or not in book form or prepared in the form of text matter. The basic characteristic of "instructional texts" is the purpose of their preparation for "use in systematic instructional activities," and they are to be distinguished from works prepared for use by a general readership.**Contributions to Collective Works.**



*Subsection (c) of section 201 deals with the troublesome problem of ownership of copyright in contributions to collective works, and the relationship between copyright ownership in a contribution and in the collective work in which it appears. The first sentence establishes the basic principle that copyright in the individual contribution and copyright in the collective work as a whole are separate and distinct, and that the author of the contribution is, as in every other case, the first owner of copyright in it. Under the definitions in section 101, a "collective work" is a species of "compilation" and, by its nature, must involve the selection, assembly, and arrangement of "a number of contributions." Examples of "collective works" would ordinarily include periodical issues, anthologies, symposia, and collections of the discrete writings of the same authors, but not cases, such as a composition consisting of words and music, a work published with illustrations or front matter, or three one-act plays, where relatively few separate elements have been brought together. Unlike the contents of other types of "compilations," each of the contributions incorporated in a "collective work" must itself constitute a "separate and independent" work, therefore ruling out compilations of information or other uncopyrightable material and works published with editorial revisions or annotations. Moreover, as noted above, there is a basic distinction between a "joint work," where the separate elements merge into a unified whole, and a "collective work," where they remain unintegrated and disparate.The bill does nothing to change the rights of the owner of copyright in a collective work under the present law. These exclusive rights extend to the elements of compilation and editing that went into the collective work as a whole, as well as the contributions that were written for hire by employees of the owner of the collective work, and those copyrighted contributions that have been transferred in writing to the owner by their authors. However, one of the most significant aims of the bill is to clarify and improve the present confused and frequently unfair legal situation with respect to rights in contributions.The second sentence of section 201(c), in conjunction with the provisions of section 404 dealing with copyright notice, will preserve the author's copyright in a contribution even if the contribution does not bear a separate notice in the author's name, and without requiring any unqualified transfer of rights to the owner of the collective work. This is coupled with a presumption that, unless there has been an express transfer of more, the owner of the collective work acquires, "only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series."The basic presumption of section 201(c) is fully consistent with present law and practice, and represents a fair balancing of equities. At the same time, the last clause of the subsection, under which the privilege of republishing the contribution under certain limited circumstances would be presumed, is an essential counterpart of the basic presumption. Under the language of this clause a publishing company could reprint a contribution from one issue in a later issue of its magazine, and could reprint an article from a 1980 edition of an encyclopedia in a 1990 revision of it; the publisher could not revise the contribution itself or include it in a new anthology or an entirely different magazine or other collective work.**Transfer of Ownership.** The principle of unlimited alienability of copyright is stated in clause (1) of section 201(d). Under that provision the ownership of a copyright, or of any part of it, may be transferred by any means of conveyance or by operation of law, and is to be treated as personal property upon the death of the owner. The term "transfer of copyright ownership" is defined in section 101 to cover any "conveyance, alienation, or hypothecation," including assignments, mortgages, and exclusive licenses, but not including nonexclusive licenses. Representatives of motion picture producers have argued that foreclosures of copyright mortgages should not be left to varying State laws, and that the statute should establish a Federal foreclosure system. However, the benefits of such a system would be of very limited application, and would not justify the complicated statutory and procedural requirements that would have to be established.Clause (2) of subsection (d) contains the first explicit statutory recognition of the principle of divisibility of copyright in our law. This provision, which has long been sought by authors and their representatives, and which has attracted wide support from other groups, means that any of the exclusive rights that go to make up a copyright, including those enumerated in section 106 and any subdivision of them, can be transferred and owned separately. The*

 casetext

*definition of "transfer of copyright ownership" in section 101 makes clear that the principle of divisibility applies whether or not the transfer is "limited in time or place of effect," and another definition in the same section provides that the term "copyright owner," with respect to any one exclusive right, refers to the owner of that particular right. The last sentence of section 201(d)(2) adds that the owner, with respect to the particular exclusive right he or she owns, is entitled "to all of the protection and remedies accorded to the copyright owner by this title." It is thus clear, for example, that a local broadcasting station holding an exclusive license to transmit a particular work within a particular geographic area and for a particular period of time, could sue, in its own name as copyright owner, someone who infringed that particular exclusive right.Subsection (e) provides that when an individual author's ownership of a copyright, or of any of the exclusive rights under a copyright, have not previously been voluntarily transferred, no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under a copyright, shall be given effect under this title.The purpose of this subsection is to reaffirm the basic principle that the United States copyright of an individual author shall be secured to that author, and cannot be taken away by any involuntary transfer. It is the intent of the subsection that the author be entitled, despite any purported expropriation or involuntary transfer, to continue exercising all rights under the United States statute, and that the governmental body or organization may not enforce or exercise any rights under this title in that situation.It may sometimes be difficult to ascertain whether a transfer of copyright is voluntary or is coerced by covert pressure. But subsection (e) would protect foreign authors against laws and decrees purporting to divest them of their rights under the United States copyright statute, and would protect authors within the foreign country who choose to resist such covert pressures.Traditional legal actions that may involve transfer of ownership, such as bankruptcy proceedings and mortgage foreclosures, are not within the scope of this subsection; the authors in such cases have voluntarily consented to these legal processes by their overt actions-for example, by filing in bankruptcy or by hypothecating a copyright.*

### EDITORIAL NOTES

***AMENDMENTS1978***-Subsec. (e). Pub. L. 95-598 inserted ", except as provided under title 11".

### STATUTORY NOTES AND RELATED SUBSIDIARIES

***EFFECTIVE DATE OF 1978 AMENDMENT***Amendment effective Oct. 1, 1979, see section 402(a) of Pub. L. 95-598 set out as an Effective Date note preceding section 101 of Title 11, Bankruptcy.

 casetext

# TAB 4

# 17 U.S.C. § 501

Section 501 - Infringement of copyright

**(a)** Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 or of the author as provided in section 106A(a), or who imports copies or phonorecords into the United States in violation of section 602, is an infringer of the copyright or right of the author, as the case may be. For purposes of this chapter (other than section 506), any reference to copyright shall be deemed to include the rights conferred by section 106A(a). As used in this subsection, the term "anyone" includes any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this title in the same manner and to the same extent as any nongovernmental entity.

**(b)** The legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it. The court may require such owner to serve written notice of the action with a copy of the complaint upon any person shown, by the records of the Copyright Office or otherwise, to have or claim an interest in the copyright, and shall require that such notice be served upon any person whose interest is likely to be affected by a decision in the case. The court may require the joinder, and shall permit the intervention, of any person having or claiming an interest in the copyright.

**(c)** For any secondary transmission by a cable system that embodies a performance or a display of a work which is actionable as an act of infringement under subsection (c) of section 111, a television broadcast station holding a copyright or other license to transmit or perform the same version of that work shall, for purposes of subsection (b) of this section, be treated as a legal or beneficial owner if such secondary transmission occurs within the local service area of that television station.

**(d)** For any secondary transmission by a cable system that is actionable as an act of infringement pursuant to section 111(c)(3), the following shall also have standing to sue:

  **(i)** the primary transmitter whose transmission has been altered by the cable system; and

  **(ii)** any broadcast station within whose local service area the secondary transmission occurs.

**(e)** With respect to any secondary transmission that is made by a satellite carrier of a performance or display of a work embodied in a primary transmission and is actionable as an act of infringement under section 119(a)(3), a network station holding a copyright or other license to transmit or perform the same version of that work shall, for purposes of subsection (b) of this section, be treated as a legal or beneficial owner if such secondary transmission occurs within the local service area of that station.

**(f)**

  **(1)** With respect to any secondary transmission that is made by a satellite carrier of a performance or display of a work embodied in a primary transmission and is actionable as an act of infringement under section 122, a television broadcast station holding a

copyright or other license to transmit or perform the same version of that work shall, for purposes of subsection (b) of this section, be treated as a legal or beneficial owner if such secondary transmission occurs within the local market of that station.

**(2)** A television broadcast station may file a civil action against any satellite carrier that has refused to carry television broadcast signals, as required under section 122(a)(2), to enforce that television broadcast station's rights under section 338(a) of the Communications Act of 1934.

*17 U.S.C. § 501*

Pub. L. 94-553, title I, §101, Oct. 19, 1976, 90 Stat. 2584; Pub. L. 100-568, §10(a), Oct. 31, 1988, 102 Stat. 2860; Pub. L. 100-667, title II, §202(3), Nov. 16, 1988, 102 Stat. 3957; Pub. L. 101-553, §2(a)(1), Nov. 15, 1990, 104 Stat. 2749; Pub. L. 101-650, title VI, §606(a), Dec. 1, 1990, 104 Stat. 5131; Pub. L. 106-44, §1(g)(5), Aug. 5, 1999, 113 Stat. 222; Pub. L. 106-113, div. B, §1000(a)(9) [title I, §§1002(b), 1011(b)(3)], Nov. 29, 1999, 113 Stat. 1536, 1501A-527, 1501A-544; Pub. L. 107-273, div. C, title III, §13210(4)(B), Nov. 2, 2002, 116 Stat. 1909; Pub. L. 116-94, div. P, title XI, §1102(c)(2), Dec. 20, 2019, 133 Stat. 3203.

### HISTORICAL AND REVISION NOTES

*HOUSE REPORT NO. 94-1476*The bill, unlike the present law, contains a general statement of what constitutes infringement of copyright. Section 501(a) identifies a copyright infringer as someone who "violates any of the exclusive rights of the copyright owner as provided by sections 106 through 118" of the bill, or who imports copies or phonorecords in violation of section 602. Under the latter section an unauthorized importation of copies or phonorecords acquired abroad is an infringement of the exclusive right of distribution under certain circumstances.The principle of the divisibility of copyright ownership, established by section 201(d), carries with it the need in infringement actions to safeguard the rights of all copyright owners and to avoid a multiplicity of suits. Subsection (b) of section 501 enables the owner of a particular right to bring an infringement action in that owner's name alone, while at the same time insuring to the extent possible that the other owners whose rights may be affected are notified and given a chance to join the action.The first sentence of subsection (b) empowers the "legal or beneficial owner of an exclusive right" to bring suit for "any infringement of that particular right committed while he or she is the owner of it." A "beneficial owner" for this purpose would include, for example, an author who had parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees.The second and third sentences of section 501(b), which supplement the provisions of the Federal Rules of Civil Procedure [Title 28, Judiciary and Judicial Procedure], give the courts discretion to require the plaintiff to serve notice of the plaintiff's suit on "any person shown, by the records of the Copyright Office or otherwise, to have or claim an interest in the copyright"; where a person's interest "is likely to be affected by a decision in the case" a court order requiring service of notice is mandatory. As under the Federal rules, the court has discretion to require joinder of "any person having or claiming an interest in the copyright"; but, if any such person wishes to become a party, the court must permit that person's intervention.In addition to cases involving divisibility of ownership in the same version of a work, section 501(b) is intended to allow a court to permit or compel joinder of the owners of rights in works upon which a derivative work is based.Section 501 contains two provisions conferring standing to sue under the statue upon broadcast stations in specific situations involving secondary transmissions by cable systems. Under subsection (c), a local television broadcaster licensed to transmit a work can sue a cable system importing the same version of the work into the broadcaster's local service area in violation of section 111(c). Subsection (d) deals with cases arising under section 111(c)(3), the provision dealing with substitution or alteration by a cable system of commercials or other programming; in such

*cases standing to sue is also conferred on: (1) the primary transmitter whose transmission has been altered by the cable system, and (2) any broadcast stations within whose local service area the secondary transmission occurs. These provisions are linked to section 509, a new provision on remedies for alteration of programming by cable systems, discussed below.***Vicarious Liability for Infringing Performances.** *The committee has considered and rejected an amendment to this section intended to exempt the proprietors of an establishment, such as a ballroom or night club, from liability for copyright infringement committed by an independent contractor, such as an orchestra leader. A well-established principle of copyright law is that a person who violates any of the exclusive rights of the copyright owner is an infringer, including persons who can be considered related or vicarious infringers. To be held a related or vicarious infringer in the case of performing rights, a defendant must either actively operate or supervise the operation of the place wherein the performances occur, or control the content of the infringing program, and expect commercial gain from the operation and either direct or indirect benefit from the infringing performance. The committee has decided that no justification exists for changing existing law, and causing a significant erosion of the public performance right.*

### EDITORIAL NOTES

**REFERENCES IN TEXT** *Section 338(a) of the Communications Act of 1934, referred to in subsec. (f)(2), is classified to section 338(a) of Title 47, Telecommunications.*

**AMENDMENTS** **2019**—*Subsec. (e). Pub. L. 116-94 substituted "section 119(a)(3)" for "section 119(a)(5)".* **2002**—*Subsec. (a). Pub. L. 107-273 substituted "122" for "121".* **1999**—*Subsec. (a). Pub. L. 106-44 substituted "121" for "118".Subsec. (e). Pub. L. 106-113, §1000(a)(9) [title I, §1011(b)(3)], substituted "performance or display of a work embodied in a primary transmission" for "primary transmission embodying the performance or display of a work".Subsec. (f). Pub. L. 106-113, §1000(a)(9) [title I, §1002(b)], added subsec. (f).* **1990**—*Subsec. (a). Pub. L. 101-650 inserted "or of the author as provided in section 106A(a)" after "118" and substituted "copyright or right of the author, as the case may be. For purposes of this chapter (other than section 506), any reference to copyright shall be deemed to include the rights conferred by section 106A(a)." for "copyright." Pub. L. 101-553 inserted sentences at end defining "anyone" and providing that any State and any instrumentality, officer, or employee be subject to the provisions of this title in the same manner and to the same extent as any nongovernmental entity.* **1988**—*Subsec. (b). Pub. L. 100-568 substituted "section 411" for "sections 205(d) and 411".Subsec. (e). Pub. L. 100-667 added subsec. (e).*

### STATUTORY NOTES AND RELATED SUBSIDIARIES

**EFFECTIVE DATE OF 1999 AMENDMENT** *Amendment by section 1000(a)(9) [title I, §1002(b)] of Pub. L. 106-113 effective July 1, 1999, and amendment by section 1000(a)(9) [title I, §1011(b)(3)] of Pub. L. 106-113 effective Nov. 29, 1999, see section 1000(a)(9) [title I, §1012] of Pub. L. 106-113 set out as a note under section 101 of this title.*

**EFFECTIVE DATE OF 1990 AMENDMENTS** *Amendment by Pub. L. 101-650 effective 6 months after Dec. 1, 1990, see section 610 of Pub. L. 101-650 set out as an Effective Date note under section 106A of this title. Pub. L. 101-553, §3, Nov. 15, 1990, 104 Stat. 2750, provided that: "The amendments made by this Act [enacting section 511 of this title and amending this section and sections 910 and 911 of this title] shall take effect with respect to violations that occur on or after the date of the enactment of this Act [Nov. 15, 1990]."*

**EFFECTIVE DATE OF 1988 AMENDMENTS** *Amendment by Pub. L. 100-667 effective Jan. 1, 1989, see section 206 of Pub. L. 100-667 set out as an Effective Date note under section 119 of this title.Amendment by Pub. L. 100-568 effective Mar. 1, 1989, with any cause of action arising under this title before such date being*



3

*governed by provisions in effect when cause of action arose, see section 13 of Pub. L. 100-568 set out as a note under section 101 of this title.*

**CAUSES OF ACTION ARISING UNDER PREDECESSOR PROVISIONS** *Pub. L. 94-553, title I, §112, Oct. 19, 1976, 90 Stat. 2600, provided that: "All causes of action that arose under title 17 before January 1, 1978, shall be governed by title 17 as it existed when the cause of action arose."*

 casetext

# TAB 5

# 17 U.S.C. § 1202

Section 1202 - Integrity of copyright management information

**(a)** FALSE COPYRIGHT MANAGEMENT INFORMATION.-No person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement-

**(1)** provide copyright management information that is false, or

**(2)** distribute or import for distribution copyright management information that is false.

**(b)** REMOVAL OR ALTERATION OF COPYRIGHT MANAGEMENT INFORMATION.-No person shall, without the authority of the copyright owner or the law-

**(1)** intentionally remove or alter any copyright management information,

**(2)** distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or

**(3)** distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law,
knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

**(c)** DEFINITION.-As used in this section, the term "copyright management information" means any of the following information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital form, except that such term does not include any personally identifying information about a user of a work or of a copy, phonorecord, performance, or display of a work:

**(1)** The title and other information identifying the work, including the information set forth on a notice of copyright.

**(2)** The name of, and other identifying information about, the author of a work.

**(3)** The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.

**(4)** With the exception of public performances of works by radio and television broadcast stations, the name of, and other identifying information about, a performer whose performance is fixed in a work other than an audiovisual work.

**(5)** With the exception of public performances of works by radio and television broadcast stations, in the case of an audiovisual work, the name of, and other identifying information about, a writer, performer, or director who is credited in the audiovisual work.

**(6)** Terms and conditions for use of the work.

**(7)** Identifying numbers or symbols referring to such information or links to such information.

**(8)** Such other information as the Register of Copyrights may prescribe by regulation, except that the Register of Copyrights may not require the provision of any information concerning the user of a copyrighted work.

**(d)** LAW ENFORCEMENT, INTELLIGENCE, AND OTHER GOVERNMENT ACTIVITIES.-This section does not prohibit any lawfully authorized investigative, protective, information security, or intelligence activity of an officer, agent, or employee of the United States, a State, or a political subdivision of a State, or a person acting pursuant to a contract with the United States, a State, or a political subdivision of a State. For purposes of this subsection, the term "information security" means activities carried out in order to identify and address the vulnerabilities of a government computer, computer system, or computer network.

**(e)** LIMITATIONS ON LIABILITY.-

**(1)** ANALOG TRANSMISSIONS.-In the case of an analog transmission, a person who is making transmissions in its capacity as a broadcast station, or as a cable system, or someone who provides programming to such station or system, shall not be liable for a violation of subsection (b) if-

**(A)** avoiding the activity that constitutes such violation is not technically feasible or would create an undue financial hardship on such person; and

**(B)** such person did not intend, by engaging in such activity, to induce, enable, facilitate, or conceal infringement of a right under this title.

**(2)** DIGITAL TRANSMISSIONS.-

**(A)** If a digital transmission standard for the placement of copyright management information for a category of works is set in a voluntary, consensus standard-setting process involving a representative cross-section of broadcast stations or cable systems and copyright owners of a category of works that are intended for public performance by such stations or systems, a person identified in paragraph (1) shall not be liable for a violation of subsection (b) with respect to the particular copyright management information addressed by such standard if-

**(i)** the placement of such information by someone other than such person is not in accordance with such standard; and

**(ii)** the activity that constitutes such violation is not intended to induce, enable, facilitate, or conceal infringement of a right under this title.

**(B)** Until a digital transmission standard has been set pursuant to subparagraph (A) with respect to the placement of copyright management information for a category of works, a person identified in paragraph (1) shall not be liable for a violation of subsection (b) with respect to such copyright management information, if the activity that constitutes such violation is not intended to induce, enable, facilitate, or conceal infringement of a right under this title, and if-



**(i)** the transmission of such information by such person would result in a perceptible visual or aural degradation of the digital signal; or

**(ii)** the transmission of such information by such person would conflict with-

**(I)** an applicable government regulation relating to transmission of information in a digital signal;

**(II)** an applicable industry-wide standard relating to the transmission of information in a digital signal that was adopted by a voluntary consensus standards body prior to the effective date of this chapter; or

**(III)** an applicable industry-wide standard relating to the transmission of information in a digital signal that was adopted in a voluntary, consensus standards-setting process open to participation by a representative cross-section of broadcast stations or cable systems and copyright owners of a category of works that are intended for public performance by such stations or systems.

**(3)** DEFINITIONS.-As used in this subsection-

**(A)** the term "broadcast station" has the meaning given that term in section 3 of the Communications Act of 1934 ( 47 U.S.C. 153 ); and

**(B)** the term "cable system" has the meaning given that term in section 602 of the Communications Act of 1934 ( 47 U.S.C. 522 ).

*17 U.S.C. § 1202*

Added Pub. L. 105-304, title I, §103(a), Oct. 28, 1998, 112 Stat. 2872; amended Pub. L. 106-44, §1(e), Aug. 5, 1999, 113 Stat. 222.

***EDITORIAL NOTES***

***REFERENCES IN TEXT****The effective date of this chapter, referred to in subsec. (e)(2)(B)(ii)(II), is Oct. 28, 1998. See section 105 of Pub. L. 105-304 set out as an Effective Date of 1998 Amendment note under section 101 of this title.*

***AMENDMENTS1999****-Subsec. (e)(2)(B). Pub. L. 106-44 substituted "category of works" for "category or works" in introductory provisions.*

 casetext

# TAB 6

# 28 U.S.C. § 1291

Section 1291 - Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

*28 U.S.C. § 1291*

June 25, 1948, ch. 646, 62 Stat. 929; Oct. 31, 1951, ch. 655, §48, 65 Stat. 726; Pub. L. 85-508, §12(e), July 7, 1958, 72 Stat. 348; Pub. L. 97-164, title I, §124, Apr. 2, 1982, 96 Stat. 36.

*HISTORICAL AND REVISION NOTESBased on title 28, U.S.C., 1940 ed., §§225(a), 933(a)(1), and section 1356 of title 48, U.S.C., 1940 ed., Territories and Insular Possessions, and sections 61 and 62 of title 7 of the Canal Zone Code (Mar. 3, 1911, ch. 231, §128, 36 Stat. 1133; Aug. 24, 1912, ch. 390, §9, 37 Stat. 566; Jan. 28, 1915, ch. 22, §2, 38 Stat. 804; Feb. 7, 1925, ch. 150, 43 Stat. 813; Sept. 21, 1922, ch. 370, §3, 42 Stat. 1006; Feb. 13, 1925, ch. 229, §1, 43 Stat. 936; Jan. 31, 1928, ch. 14, §1, 45 Stat. 54; May 17, 1932, ch. 190, 47 Stat. 158; Feb. 16, 1933, ch. 91, §3, 47 Stat. 817; May 31, 1935, ch. 160, 49 Stat. 313; June 20, 1938, ch. 526, 52 Stat. 779; Aug. 2, 1946, ch. 753, §412(a)(1), 60 Stat. 844).This section rephrases and simplifies paragraphs "First", "Second", and "Third" of section 225(a) of title 28, U.S.C., 1940 ed., which referred to each Territory and Possession separately, and to sections 61 and 62 of the Canal Zone Code, section 933(a)(1) of said title relating to jurisdiction of appeals in tort claims cases, and the provisions of section 1356 of title 48, U.S.C., 1940 ed., relating to jurisdiction of appeals from final judgments of the district court for the Canal Zone.The district courts for the districts of Hawaii and Puerto Rico are embraced in the term "district courts of the United States." (See definitive section 451 of this title.) Paragraph "Fourth" of section 225(a) of title 28, U.S.C., 1940 ed., is incorporated in section 1293 of this title. Words "Fifth. In the United States Court for China, in all cases" in said section 225(a) were omitted. (See reviser's note under section 411 of this title.) Venue provisions of section 1356 of title 48, U.S.C., 1940 ed., are incorporated in section 1295 of this title. Section 61 of title 7 of the Canal Zone Code is also incorporated in sections 1291 and 1295 of this title.In addition to the jurisdiction conferred by this chapter, the courts of appeals also have appellate jurisdiction in proceedings under Title 11, Bankruptcy, and jurisdiction to review: (1) Orders of the Secretary of the Treasury denying an application for, suspending, revoking, or annulling a basic permit under chapter 8 of title 27;(2) Orders of the Interstate Commerce Commission, the Federal Communications Commission, the Civil Aeronautics Board, the Board of Governors of the Federal Reserve System and the Federal Trade Commission, based on violations of the antitrust laws or unfair or deceptive acts, methods, or practices in commerce;(3) Orders of the Secretary of the Army under sections 504, 505 and 516 of title 33, U.S.C., 1940 ed., Navigation and Navigable Waters; (4) Orders of the Civil Aeronautics Board under chapter 9 of title 49, except orders as to foreign air carriers which are subject to the President's approval;(5) Orders under chapter 1 of title 7, refusing to designate boards of trade as contract markets or suspending or revoking such designations, or excluding persons from trading in contract markets; (6) Orders of the Federal Power Commission under chapter 12 of title 16;(7) Orders of the Federal Security*



*Administrator under section 371(e) of title 21, in a case of actual controversy as to the validity of any such order, by any person adversely affected thereby;(8) Orders of the Federal Power Commission under chapter 15B of title 15; (9) Final orders of the National Labor Relations Board; (10) Cease and desist orders under section 193 of title 7;(11) Orders of the Securities and Exchange Commission;(12) Orders to cease and desist from violating section 1599 of title 7;(13) Wage orders of the Administrator of the Wage and Hour Division of the Department of Labor under section 208 of title 29;(14) Orders under sections 81r and 1641 of title 19, U.S.C., 1940 ed., Customs Duties. The courts of appeals also have jurisdiction to enforce: (1) Orders of the Interstate Commerce Commission, the Federal Communications Commission, the Civil Aeronautics Board, the Board of Governors of the Federal Reserve System, and the Federal Trade Commission, based on violations of the antitrust laws or unfair or deceptive acts, methods, or practices in commerce; (2) Final orders of the National Labor Relations Board; (3) Orders to cease and desist from violating section 1599 of title 7.The Court of Appeals for the District of Columbia also has jurisdiction to review orders of the Post Office Department under section 576 of title 39 relating to discriminations in sending second-class publications by freight; Maritime Commission orders denying transfer to foreign registry of vessels under subsidy contract; sugar allotment orders; decisions of the Federal Communications Commission granting or refusing applications for construction permits for radio stations, or for radio station licenses, or for renewal or modification of radio station licenses, or suspending any radio operator's license.Changes were made in phraseology.*

### EDITORIAL NOTES

**AMENDMENTS1982**- *Pub. L. 97-164, §124, inserted "(other than the United States Court of Appeals for the Federal Circuit)" after "The court of appeals" and inserted provision that the jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.***1958**- *Pub. L. 85-508 struck out provisions which gave courts of appeals jurisdiction of appeals from District Court for Territory of Alaska. See section 81A of this title which establishes a United States District Court for the State of Alaska.* **1951**-*Act Oct. 31, 1951, inserted reference to District Court of Guam.*

### STATUTORY NOTES AND RELATED SUBSIDIARIES

**EFFECTIVE DATE OF 1982 AMENDMENT** *Amendment by Pub. L. 97-164 effective Oct. 1, 1982, see section 402 of Pub. L. 97-164 set out as a note under section 171 of this title.*

**EFFECTIVE DATE OF 1958 AMENDMENT** *Amendment by Pub. L. 85-508 effective Jan. 3, 1959, on admission of Alaska into the Union pursuant to Proc. No. 3269, Jan. 3, 1959, 24 F.R. 81, 73 Stat. c.16 as required by sections 1 and 8(c) of Pub. L. 85-508 see notes set out under section 81A of this title and preceding section 21 of Title 48, Territories and Insular Possessions.*

### TERMINATION OF UNITED STATES DISTRICT COURT FOR THE DISTRICT OF THE CANAL

**ZONE***For termination of the United States District Court for the District of the Canal Zone at end of the "transition period", being the 30-month period beginning Oct. 1, 1979, and ending midnight Mar. 31, 1982, see Paragraph 5 of Article XI of the Panama Canal Treaty of 1977 and sections 2101 and 2201 to 2203 of Pub. L. 96-70, title II, Sept. 27, 1979, 93 Stat. 493, formerly classified to sections 3831 and 3841 to 3843, respectively, of Title 22, Foreign Relations and Intercourse.*

 casetext

# TAB 7

# 28 U.S.C. § 1331

Section 1331 - Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

*28 U.S.C. § 1331*

June 25, 1948, ch. 646, 62 Stat. 930; Pub. L. 85-554, §1, July 25, 1958, 72 Stat. 415; Pub. L. 94-574, §2, Oct. 21, 1976, 90 Stat. 2721; Pub. L. 96-486, §2(a), Dec. 1, 1980, 94 Stat. 2369.

**HISTORICAL AND REVISION NOTES**Based on title 28, U.S.C., 1940 ed., §41(1) (Mar. 3, 1911, ch. 231, §24, par. 1, 36 Stat. 1091; May 14, 1934, ch. 283, §1, 48 Stat. 775; Aug. 21, 1937, ch. 726, §1, 50 Stat. 738; Apr. 20, 1940, ch. 117, 54 Stat. 143).Jurisdiction of federal questions arising under other sections of this chapter is not dependent upon the amount in controversy. (See annotations under former section 41 of title 28, U.S.C.A., and 35 C.J.S., p. 833 et seq., §§30-43. See, also, reviser's note under section 1332 of this title.)Words "wherein the matter in controversy exceeds the sum or value of $3,000, exclusive of interest and costs," were added to conform to rulings of the Supreme Court. See construction of provision relating to jurisdictional amount requirement in cases involving a Federal question in United States v. Sayward, 16 S.Ct. 371, 160 U.S. 493, 40 L.Ed. 508; Fishback v. Western Union Tel. Co., 16 S.Ct. 506, 161 U.S. 96, 40 L.Ed. 630; and Halt v. Indiana Manufacturing Co., 1900, 20 S.Ct. 272, 176 U.S. 68, 44 L.Ed. 374.Words "all civil actions" were substituted for "all suits of a civil nature, at common law or in equity" to conform with Rule 2 of the Federal Rules of Civil Procedure.Words "or treaties" were substituted for "or treaties made, or which shall be made under their authority," for purposes of brevity.The remaining provisions of section 41(1) of title 28, U.S.C., 1940 ed., are incorporated in sections 1332, 1341, 1342, 1345, 1354, and 1359 of this title.Changes were made in arrangement and phraseology.

**EDITORIAL NOTES**

**AMENDMENTS**1980- Pub. L. 96-486 struck out "; amount in controversy; costs" in section catchline, struck out minimum amount in controversy requirement of $10,000 for original jurisdiction in federal question cases which necessitated striking the exception to such required minimum amount that authorized original jurisdiction in actions brought against the United States, any agency thereof, or any officer or employee thereof in an official capacity, struck out provision authorizing the district court except where express provision therefore was made in a federal statute to deny costs to a plaintiff and in fact impose such costs upon such plaintiff where plaintiff was adjudged to be entitled to recover less than the required amount in controversy, computed without regard to set-off or counterclaim and exclusive of interests and costs, and struck out existing subsection designations.**1976**-Subsec. (a). Pub. L. 94-574 struck out $10,000 jurisdictional amount where action is brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity. **1958**- Pub. L. 85-554 included costs in section catchline, designated existing provisions as subsec. (a), substituted "$10,000" for "$3,000", and added subsec. (b).

**STATUTORY NOTES AND RELATED SUBSIDIARIES**

**EFFECTIVE DATE OF 1980 AMENDMENT; APPLICABILITY**Pub. L. 96-486, §4, Dec. 1, 1980, 94 Stat. 2370, provided: "This Act [amending this section and section 2072 of Title 15, Commerce and Trade, and enacting provisions set out as a note under section 1 of this title] shall apply to any civil action pending on the

 casetext

1

*date of enactment of this Act [Dec. 1, 1980]."*

**EFFECTIVE DATE OF 1958 AMENDMENT***Pub. L. 85-554, §3, July 25, 1958, 72 Stat. 415, provided that:*

*"This Act [amending this section and sections 1332 and 1345 of this title] shall apply only in the case of actions commenced after the date of the enactment of this Act [July 25, 1958]."*

 casetext

# TAB 8

# 28 U.S.C. § 1367

Section 1367 - Supplemental jurisdiction

**(a)** Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

**(b)** In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

**(c)** The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if-

> **(1)** the claim raises a novel or complex issue of State law,

> **(2)** the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

> **(3)** the district court has dismissed all claims over which it has original jurisdiction, or

> **(4)** in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

**(d)** The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

**(e)** As used in this section, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

*28 U.S.C. § 1367*

Added Pub. L. 101-650, title III, §310(a), Dec. 1, 1990, 104 Stat. 5113.

***EDITORIAL NOTES***

***REFERENCES IN TEXT*** The Federal Rules of Civil Procedure, referred to in subsec. (b), are set out in the Appendix to this title.

***STATUTORY NOTES AND RELATED SUBSIDIARIES***



**EFFECTIVE DATE** *Pub. L. 101-650, title III, §310(c), Dec. 1, 1990, 104 Stat. 5114, provided that: "The amendments made by this section [enacting this section] shall apply to civil actions commenced on or after the date of the enactment of this Act [Dec. 1, 1990]."*

 casetext

# TAB 9

# 28 U.S.C. § 2106

Section 2106 - Determination

The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.

*28 U.S.C. § 2106*

June 25, 1948, ch. 646, 62 Stat. 963.

*HISTORICAL AND REVISION NOTES Based on title 28, U.S.C., 1940 ed., §§344, 876, 877 (R.S. §701; Mar. 3, 1891, ch. 517, §§10, 11, 26 Stat. 829; Mar. 3, 1911, ch. 231, §§231, 236, 237, 291, 36 Stat. 1156, 1167; Dec. 23, 1914, ch. 2, 38 Stat. 790; Sept. 16, 1916, ch. 448, §2, 39 Stat. 726; Feb. 17, 1922, ch. 54, 42 Stat. 366; Feb. 13, 1925, ch. 229, §1, 43 Stat. 937; Jan. 31, 1928, ch. 14, §1, 45 Stat. 54).Section consolidates part of section 344 of title 28, U.S.C., 1940 ed., with sections 876 and 877 of said title. Other provisions of said section 344 are incorporated in sections 1257 and 2103 of this title.Words "or a court of appeals" were inserted after "Supreme Court" upon authority of United States v. Illinois Surety Co., C.C.A. 1915, 226 F. 653, affirmed 37 S.Ct. 614, 244 U.S. 376, 61 L.Ed. 1206, wherein it was held that this section also applied to the courts of appeals in view of section 11 of the Circuit Court of Appeals Act of Mar. 3, 1891, ch. 517, 28 Stat. 829.The revised section will cover instances where the Supreme Court remands a case to the highest court of a State and to the United States Tax Court. It will also cover a remand of a case to the Court of Claims or the Court of Customs and Patent Appeals. For authority to remand a case to The Tax Court, see Equitable Life Assurance Society of U.S. v. Commissioner of Internal Revenue, 1944, 64 S.Ct. 722, 321 U.S. 560, 88 L.Ed. 927.Revised section will also permit a remand by the Supreme Court to a court of appeals inasmuch as such latter court then would be a lower court. The revised section is in conformity with numerous holdings of the Supreme Court to the effect that such a remand may be made. See especially, Maryland Casualty Co. v. United States, 1929, 49 S.Ct. 484, 279 U.S. 792, 73 L.Ed. 960; Krauss Bros. Co. v. Mellon, 1928, 48 S.Ct. 358, 276 U.S. 386, 72 L.Ed. 620 and Buzyuski v. Luckenbach S. S. Co., 1928, 48 S.Ct. 440, 277 U.S. 226, 72 L.Ed. 860.The last sentence of section 876 of title 28, U.S.C., 1940 ed., providing that the Supreme Court should not issue execution but should send a special mandate to the inferior court to award execution, was omitted. See rule 34 of the revised rules of the Supreme Court relating to Mandates, and section 1651 of this title authorizing the Supreme Court to issue all writs necessary in aid of its jurisdiction.Changes were made in phraseology.*

 casetext

# TAB 10

# Cal. Code Civ. Proc. § 1715

Section 1715 - Applicability of chapter

**(a)** Except as otherwise provided in subdivision (b), this chapter applies to a foreign-country judgment to the extent that the judgment both:

**(1)** Grants or denies recovery of a sum of money.

**(2)** Under the law of the foreign country where rendered, is final, conclusive, and enforceable.

**(b)** This chapter does not apply to a foreign-country judgment, even if the judgment grants or denies recovery of a sum of money, to the extent that the judgment is any of the following:

**(1)** A judgment for taxes.

**(2)** A fine or other penalty.

**(3)**

**(A)** A judgment for divorce, support, or maintenance, or other judgment rendered in connection with domestic relations.

**(B)** A judgment for divorce, support, or maintenance, or other judgment rendered in connection with domestic relations may be recognized by a court of this state pursuant to Section 1723.

**(c)** A party seeking recognition of a foreign-country judgment has the burden of establishing that the foreign-country judgment is entitled to recognition under this chapter.

*Ca. Civ. Proc. Code § 1715*

Added by Stats 2007 ch 212 (SB 639),s 2, eff. 1/1/2008.



1

# TAB 11

# Cal. Code Civ. Proc. § 1718

Section 1718 - Recognition issue raise by filing action; raised by filing counterclaim, cross-claim or affirmative defense

**(a)** If recognition of a foreign-country judgment is sought as an original matter, the issue of recognition shall be raised by filing an action seeking recognition of the foreign-country judgment.

**(b)** If recognition of a foreign-country judgment is sought in a pending action, the issue of recognition may be raised by counterclaim, cross-claim, or affirmative defense.

*Ca. Civ. Proc. Code § 1718*

Added by Stats 2007 ch 212 (SB 639),s 2, eff. 1/1/2008.

 casetext

# TAB 12

# Cal. Code Civ. Proc. § 1723

Section 1723 - Recognition under principles of comity or otherwise

This chapter does not prevent the recognition under principles of comity or otherwise of a foreign-country judgment not within the scope of this chapter.

*Ca. Civ. Proc. Code § 1723*

Added by Stats 2007 ch 212 (SB 639),s 2, eff. 1/1/2008.

 casetext